MONITOR PATRIOT CO. ET AL. *v.*
ROY, EXECUTRIX

No. 62.   Argued December 17, 1970—Decided February 24, 1971

STEWART, J., delivered the opinion of the Court, in which BURGER, C. J., and HARLAN, BRENNAN, WHITE, MARSHALL, and BLACKMUN, JJ., joined. WHITE, J., filed a concurring opinion, *post*, p. 301. BLACK, J., filed an opinion concurring in the judgment and dissenting in part, in which DOUGLAS, J., joined, *post*, p. 277.

*Edward Bennett Williams* argued the cause for petitioners. With him on the briefs were *Harold Ungar* and *Joseph A. Millimet.*

*Stanley M. Brown* argued the cause and filed a brief for respondent.

MR. JUSTICE STEWART delivered the opinion of the Court.

On September 10, 1960, three days before the New Hampshire Democratic Party's primary election of candidates for the United States Senate, the Concord Monitor, a daily newspaper in Concord, New Hampshire, published a syndicated "D. C. Merry-Go-Round" column discussing the forthcoming election. The column spoke of political maneuvering in the primary campaign, referred to the criminal records of several of the candidates, and characterized Alphonse Roy, one of the candidates, as a "former small-time bootlegger." [1] Roy was not

---

[1] The text of the portion of the column concerning the New Hampshire primary was as follows:

"Political Snafu

"Rock-ribbed Republican New Hampshire, whose ex-Gov. Sherman Adams was top kick in the White House for years and whose Sen. Styles Bridges is still top kick on the GOP side of the Senate,

elected in the primary, and he subsequently sued the Monitor Patriot Co. and the North American Newspaper Alliance (NANA), the distributor of the column, for libel.

---

is so fouled up in a primary snafu that the state may go Democratic this year. The primary verdict is due next Tuesday.

"Even that able Senate stalwart, Styles Bridges, is restirring himself. He has nothing to worry about from his Republican opponent, but the Democrats have put up a dynamic Dartmouth professor, Herbert Hill, against him. The professor came within 11,000 votes of defeating Sherman Adams, lately of vicuna-coat fame, in the 1948 gubernatorial race.

"Curiously, the Democratic primary has been cluttered with a motley assortment of candidates who have challenged Hill for the privilege of running against Bridges. That sly, old Republican disclaims any connection with it, but he appears pleased over the muddying of Democratic waters.

"One of Hill's primary opponents Frank L. Sullivan, was released from the Grasmere County Work Farm just in time to file for the Senate. With a police record of no fewer than 19 convictions for drunkenness since 1945, he was serving his latest 90-day sentence.

"Curious Call

"To make sure he would get out in time to run for the Senate, a former small-time bootlegger and later U. S. Marshal, Alphonse Roy, telephoned the Grasmere warden about Sullivan.

"Ralph LaVallee in charge of Grasmere, admitted to this column that he had received a telephone inquiry from Roy as to whether Sullivan would be released in time to file. But the warden denied another report that Roy had announced he was calling 'on behalf of my friend Styles.'

" 'I don't want to get implicated in anything like that,' said LaVallee, 'Roy didn't mention Senator Bridges.'

"Sullivan happily got out of the workhouse in time to run for the most distinguished legislative body in the world. And who should turn up on the ballot but the same Alphonse Roy who was so eager to get him out of the clink.

"Because of the peculiar population division of New Hampshire, the Irish Catholics may be inclined to vote for a Frank Sullivan while the French Canadians could be attracted by a name like

The newspaper and NANA offered "truth" as their primary defense at trial, and evidence was presented on the issue of whether or not Roy had in fact been a bootlegger during the prohibition era. The defendants also alleged that they had published in good faith, without malice, with a reasonable belief in the probable truth of the charge, and on a lawful occasion. At the close of the evidence, the trial judge instructed the jury at great length on the law to be applied to the case. Three possible defenses emerged from these jury instructions.

First, the trial judge told the jury that Roy was a "public official" by virtue of his candidacy in the primary. As a consequence, a special rule, requiring a showing that the article was false and had been published with "knowledge of its falsity or with a reckless disregard of whether it was false or true," would apply so long as the libel concerned "official conduct" as opposed to "private conduct." This private-public distinction was elaborated as follows: "Is it more probable than otherwise that the publication that the plaintiff was a former small-time bootlegger was a public affair on a par with

_____

Alphonse Roy. The effect would be to cut down Herb Hill's chances.

"Convicts For Senator

"Two other curious candidates, who tried to run in the Democratic primary against Hill, were Harold P. McCarthy who has a record of nine convictions for drunkenness, assault, and brawling, and Clement P. Robinson Jr., who has a record of six brushes with the law for drunkenness and traffic violations. Robinson also received a 30-day suspended sentence for stealing two power lawnmowers and a conviction for the nonsupport of his wife and three children.

"But at least Professor Hill managed to persuade the New Hampshire Ballot Law Commission into knocking McCarthy and Robinson off the ballot."

official conduct of public officials?" The trial judge went on:

> "As a candidate for the United States Senate, the plaintiff was within the public official concept, and a candidate must surrender to public scrutiny and discussion so much of his private character as affects his fitness for office. That is, anything which might touch on Alphonse Roy's fitness for the office of United States Senator would come within the concept of official conduct. If it would not touch upon or be relevant to his fitness for the office for which he was a candidate but was rather a bringing forward of the plaintiff's long forgotten misconduct in which the public had no interest, then it would be a private matter in the private sector."

The judge then instructed the jury that if it found the libel to be in the "public sector" it must bring in a verdict for NANA, since there had been no evidence that NANA had engaged in knowing or reckless falsehood, but that it still had to decide on the "preponderance of the evidence" whether the newspaper was liable.

Supposing the publication to be in the "private sector," the trial judge instructed the jury that there were two possible defenses available to the newspaper and NANA. The first was "justification," which would prevail if the jury found that the article was both true and published on a "lawful occasion." [2] The second defense was "con-

---

[2] The trial judge gave the jury the following definition of a "lawful occasion":

"If the end to be attained by the publication is justifiable, that is, to give useful information to those who have a right and ought to know in order that they may act upon such information, the occasion is lawful. Where, however, there is merely the color of a lawful occasion and the defendant, instead of acting in good faith,

ditional privilege," which could prevail even if the jury found the article to be false, but only if it also found that its publication was "on a lawful occasion, in good faith, for a justifiable purpose, and with a belief founded on reasonable grounds of the truth of the matter published."

The jury returned a verdict of $20,000, of which $10,000 was against the newspaper and $10,000 against NANA. On appeal, the New Hampshire Supreme Court affirmed the judgment, holding that the trial judge properly sent to the jury the question of whether or not the particular libel alleged was "relevant" to Roy's fitness for office. 109 N. H. 441, 254 A. 2d 832. We granted certiorari in order to consider the constitutional issues presented by the case. 397 U. S. 904.

I

In *New York Times Co.* v. *Sullivan,* 376 U. S. 254, 279–280, we held that the First and Fourteenth Amendments require "a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." The rule of *New York Times* was based on a recognition that the First Amendment guarantee of a free press is inevitably in tension with state libel laws designed to secure society's interest in the protection of individual reputation. The approach of *New York Times* was to identify a class of person—

---

assumes to act for some justifiable end merely as a pretense to publish and circulate defamatory matter, or for other unlawful purpose, he is liable in the same manner as if such pretense had not been resorted to."

The trial judge placed the burden of showing a "lawful occasion" on the defendants.

there public officials—and a type of activity—there official conduct—and to require as to defamations respecting them a particularly high standard of liability—knowing falsehood or reckless disregard of the truth. Later cases have made it clear that the applicability of this basic approach is not limited to those in public office or to the performance of official acts, or, for that matter, to conventional civil libel suits. *Garrison* v. *Louisiana,* 379 U. S. 64; *Curtis Publishing Co.* v. *Butts,* 388 U. S. 130; *Greenbelt Cooperative Publishing Assn.* v. *Bresler,* 398 U. S. 6.

This case went to the jury in December 1966, after our decisions in *New York Times* and *Garrison,* but before *Curtis* and *Greenbelt.* The trial judge instructed the jury that Roy, as a candidate for elective public office, was a "public official," and that characterization has not been challenged here. Given the later cases, it might be preferable to categorize a candidate as a "public figure," if for no other reason than to avoid straining the common meaning of words. But the question is of no importance so far as the standard of liability in this case is concerned, for it is abundantly clear that, whichever term is applied, publications concerning candidates must be accorded at least as much protection under the First and Fourteenth Amendments as those concerning occupants of public office. That *New York Times* itself was intended to apply to candidates, in spite of the use of the more restricted "public official" terminology, is readily apparent from that opinion's text and citations to case law.[3] And if it be conceded that the First

---

[3] One of the citations was to a Kansas decision which admirably stated the case for the inclusion of candidates within the rule:

"[I]t is of the utmost consequence that the people should discuss the character and qualifications of candidates for their suffrages. The importance to the state and to society of such discussions is so vast, and the advantages derived are so great, that they more than counter-

Amendment was "fashioned to assure the unfettered interchange of ideas for the bringing about of political and social changes desired by the people," *Roth* v. *United States*, 354 U. S. 476, 484, then it can hardly be doubted that the constitutional guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political office.

## II

The jury in this case returned verdicts against both the newspaper and NANA. It is clear, therefore, that it found the bootlegger charge to be in the "private sector," since it had been instructed that unless it so found it could not impose liability on NANA. It is possible that having made this determination, it then concluded that the charge was true but "unjustified"— that is, that it had been published without a "lawful occasion." In any event, under the trial judge's instructions it was also free to return a money verdict if it found that the publication was false and had not been made "in good faith," for a "justifiable purpose," and with a "belief founded on reasonable grounds of the truth of the matter published." Since this standard is far less stringent than that of knowing falsehood or reckless disregard of the truth, the judgment must be reversed unless it can be shown that the *New York Times* rule is not applicable because of the nature of the libel in question. Cf. *Ocala Star-Banner Co.* v. *Damron, post,* p. 295.

---

balance the inconvenience of private persons whose conduct may be involved, and occasional injury to the reputations of individuals must yield to the public welfare, although at times such injury may be great. The public benefit from publicity is so great, and the chance of injury to private character so small, that such discussion must be privileged." *Coleman* v. *MacLennan,* 78 Kan. 711, 724, 98 P. 281, 286 (1908).

The respondent argues that under *New York Times* a plaintiff has a special burden of proof only as to libels "relating to official conduct," that for a candidate "official conduct" means "conduct relevant to fitness for office," and that the public-private issue is one of fact for the jury. In our view, however, the syllogistic manipulation of distinctions between "private sectors" and "public sectors," or matters of fact and matters of law, is of little utility in resolving questions of First Amendment protection.

In *Garrison* v. *Louisiana, supra,* we reversed a conviction for criminal libel of a man who had charged that a group of state court judges were inefficient, took excessive vacations, opposed official investigations of vice, and were possibly subject to "racketeer influences." The Louisiana Supreme Court had held that these statements were not "criticisms . . . of the manner in which any one of the eight judges conducted his court when in session," but rather were accusations of crime and "personal attacks upon the integrity and honesty" of the judges. This Court rejected the proposed distinction:

> "Of course, any criticism of the manner in which a public official performs his duties will tend to affect his private, as well as his public, reputation. The *New York Times* rule is not rendered inapplicable merely because an official's private reputation, as well as his public reputation, is harmed. The public-official rule protects the paramount public interest in a free flow of information to the people concerning public officials, their servants. To this end, anything which might touch on an official's fitness for office is relevant. Few personal attributes are more germane to fitness for office than dishonesty, malfeasance, or improper motivation, even though these

characteristics may also affect the official's private character." 379 U. S., at 76–77.

Cf. *Ocala Star-Banner Co.* v. *Damron, supra.*

The considerations that led us thus to reformulate the "official conduct" rule of *New York Times* in terms of "anything which might touch on an official's fitness for office" apply with special force to the case of the candidate. Indeed, whatever vitality the "official conduct" concept may retain with regard to occupants of public office, cf. *Garrison, supra,* at 72 n. 8, it is clearly of little applicability in the context of an election campaign. The principal activity of a candidate in our political system, his "office," so to speak, consists in putting before the voters every conceivable aspect of his public and private life that he thinks may lead the electorate to gain a good impression of him. A candidate who, for example, seeks to further his cause through the prominent display of his wife and children can hardly argue that his qualities as a husband or father remain of "purely private" concern. And the candidate who vaunts his spotless record and sterling integrity cannot convincingly cry "Foul!" when an opponent or an industrious reporter attempts to demonstrate the contrary.[4] Any test adequate to safeguard First Amendment guarantees in this area must go far beyond the customary meaning of the phrase "official conduct."

---

[4] A commentator writing in 1949 described the ambience as follows: "Charges of gross incompetence, disregard of the public interest, communist sympathies, and the like have usually filled the air; and hints of bribery, embezzlement, and other criminal conduct are not infrequent. If actionable defamation is possible in this field, one might suppose that the chief energies of the courts, for some time after every political campaign, would be absorbed by libel and slander suits." Noel, Defamation of Public Officers and Candidates, 49 Col. L. Rev. 875.

Given the realities of our political life, it is by no means easy to see what statements about a candidate might be altogether without relevance to his fitness for the office he seeks. The clash of reputations is the staple of election campaigns, and damage to reputation is, of course, the essence of libel. But whether there remains some exiguous area of defamation against which a candidate may have full recourse is a question we need not decide in this case. The trial judge presented the issue to the jury in the form of the question: "Is it more probable than otherwise that the publication that the plaintiff was a former small-time bootlegger was a public affair on a par with official conduct of public officials?" This instruction, and the others like it, left the jury far more leeway to act as censors than is consistent with the protection of the First and Fourteenth Amendments in the setting of a political campaign.

The application of the traditional concepts of tort law to the conduct of a political campaign is bound to raise dangers for freedom of speech and of the press. The reasonable-man standard of liability, for example, serves admirably the essential function of imposing an objective and socially acceptable limit on the freedom of an individual to act with relation to others. But under our system of government, we have chosen to afford protection even to "opinions that we loathe and believe to be fraught with death," *Abrams* v. *United States,* 250 U. S. 616, 630 (Holmes, J., dissenting). A community that imposed legal liability on all statements in a political campaign deemed "unreasonable" by a jury would have abandoned the First Amendment as we know it. Likewise, a "preponderance of the evidence" burden of proof plays an indispensable role in the control of private negligence. But we have recognized that in the realm of political belief "the tenets of one man may seem the

rankest error to his neighbor," and that the advocates whom we protect may resort to "exaggeration, to vilification of men who have been, or are, prominent in church or state, and even to false statement," *Cantwell* v. *Connecticut,* 310 U. S. 296, 310. It is simply inconsistent with this commitment to permit the imposition of liability for political speech that "more probably than otherwise" in the opinion of the jury "would not touch upon or be relevant" to a candidate's fitness for office. Cf. *Speiser* v. *Randall,* 357 U. S. 513, 525–526; *Smith* v. *California,* 361 U. S. 147.

It is perhaps unavoidable that in the area of tension between the Constitution and the various state laws of defamation there will be some uncertainty as to what publications are and what are not protected. The mental element of "knowing or reckless disregard" required under the *New York Times* test, for example, is not always easy of ascertainment. "Inevitably its outer limits will be marked out through case-by-case adjudication, as is true with so many legal standards for judging concrete cases, whether the standard is provided by the Constitution, statutes, or case law." *St. Amant* v. *Thompson,* 390 U. S. 727, 730–731. But there is a major, and in this case decisive, difference between liability based on a standard of care, and liability based on a judgment of the "relevance" of a past incident of criminal conduct to an official's or a candidate's fitness for office. A standard of care "can be neutral with respect to content of the speech involved, free of historical taint, and adjusted to strike a fair balance between the interests of the community in free circulation of information and those of individuals in seeking recompense for harm done by the circulation of defamatory falsehood." *Curtis Publishing Co.* v. *Butts, supra,* at 153 (opinion of HARLAN, J.). A standard of "relevance," on the other hand, especially such a standard applied by a jury under the preponderance-of-the-

evidence test, is unlikely to be neutral with respect to the content of speech and holds a real danger of becoming an instrument for the suppression of those "vehement, caustic, and sometimes unpleasantly sharp attacks," *New York Times, supra,* at 270, which must be protected if the guarantees of the First and Fourteenth Amendments are to prevail.

We therefore hold as a matter of constitutional law that a charge of criminal conduct, no matter how remote in time or place, can never be irrelevant to an official's or a candidate's fitness for office for purposes of application of the "knowing falsehood or reckless disregard" rule of *New York Times Co.* v. *Sullivan.* Since the jury in this case was permitted to make its own unguided determination that the charge of prior criminal activity was not "relevant," and that the *New York Times* standard was thus inapplicable, the judgment must be reversed and the case remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

[For concurring opinion of MR. JUSTICE WHITE, see *post,* p. 301.]

Separate opinion of MR. JUSTICE BLACK, with whom MR. JUSTICE DOUGLAS joins.*

I concur in the judgments of the Court in this case and in No. 109 and No. 118, for the reasons set out in my concurring opinion in *New York Times Co.* v. *Sullivan,* 376 U. S. 254, 293 (1964), in my concurring and dissenting opinion in *Curtis Publishing Co.* v. *Butts,* 388 U. S. 130, 170 (1967), and in MR. JUSTICE DOUGLAS' concurring opinion in *Garrison* v. *Louisiana,* 379 U. S. 64, 80 (1964).

---

*[This opinion applies also to No. 109, *Time, Inc.* v. *Pape, post,* p. 279, and No. 118, *Ocala Star Banner Co. et al.* v. *Damron, post,* p. 295.]

However, I dissent from those portions of the opinions in this case and No. 118 which would permit these libel cases to be tried again under a different set of jury instructions. As I have stated before, "[I]t is time for this Court to abandon *New York Times Co.* v. *Sullivan* and adopt the rule to the effect that the First Amendment was intended to leave the press free from the harassment of libel judgments." *Curtis Publishing Co.* v. *Butts, supra,* at 172 (separate opinion of BLACK, J.).