J. Denis JACKSON

v.

The ATLANTIC MONTHLY COMPANY, and C. Michael Curtis, Individually and as Associate Editor of the Atlantic Monthly Magazine Owned by the Atlantic Monthly Company.

Civ. A. No. 13145.

United States District Court,
N. D. Georgia,
Atlanta Division.

March 26, 1971.

J. Denis Jackson, pro se.

Gambrell, Russell, Killorin, Wade & Forbes, E. Smythe Gambrell and Sewell K. Loggins, Atlanta, Ga., for defendants.

## ORDER

O'KELLEY, District Judge.

This is a libel action against a magazine publisher and the writer of an article appearing therein.

The plaintiff is a Negro physician residing and practicing in Atlanta. The defendant corporation is the owner and publisher of the magazine, "Atlantic Monthly." The defendant, C. Michael Curtis is an Associate Editor of the magazine and was the author of the article by which the plaintiff claims to have been libeled.

The scene was set for this dispute in May of 1969. The Urban League, through its now deceased Director, Whitney Young, arranged for certain journalists to tour ghetto areas of several major cities of the Nation. Included in the group of journalists invited was the defendant. Included in the cities on the tour was Atlanta.

In Atlanta, as in the other cities, arrangements were made for interviews with leaders in the community. Such an interview was arranged with the plaintiff.

Besides being a physician, the plaintiff was at the time, a candidate for the Atlanta School Board and was also the author of several books and articles of national note. He also was a lecturer and public speaker. The plaintiff described himself as a public figure in the community and as a "national figure," and claims credit for several national slogans of civil rights prominence.

The "interview" was described as a monologue by plaintiff which lasted for two or more hours. During this time, plaintiff delivered a discourse on historical, social, and racial matters, economics, and other subjects.

Upon the conclusion of the tour, the defendant wrote an article for publica-

tion about his experiences on the trip. The article was published in the Atlantic Monthly in the August 1969 issue. A portion of the article dealt with the "interview" of the plaintiff.

The part of the publication complained of is as follows:

"Jackson introduces himself as 'the first cultural psychiatrist in the United States,' and guesses that we didn't know he was the source of 'black power' as a political slogan. He guesses right.'

"I see the basic problem of the black man in America as a mass neurosis,' he says, citing Wilhelm Reich as the source for his theories about the debilitating consequences of 'the suppression of the capacity for love.' 'A satisfactory sexual climax,' says Jackson, is the answer to mental health, and the key to good sex is 'powerfulness,' as opposed to 'powerlessness.'

"What follows is a remarkable, and increasingly manic, diatribe against the white man in history." * * *

"On George Washington: 'A thug, a traitor, a murderer, a slaveholder, an uncivilized barbarian, a bastardizer.' "

"On the American flag: 'I consider the American flag toilet paper.' " * *

"Later, Dale wants to know what I think of Doctor Jackson. I say, I think he is a dangerous man, who needs hate to fortify his own faltering sense of adequacy. She says he's running for election to the Atlanta School Board. As if Atlanta didn't have enough problems."

The plaintiff contends that the article conveyed the impression that he was a dangerous man, a bigot, unpatriotic, of poor judgment, and without love or pride for his country. He also contends that the article was false and was made with malice and with intent to injure the plaintiff.

In passing, the following legal proceedings must be noted. The Complaint was filed in this Court on October 6, 1969, based on diversity of citizenship.

Plaintiff filed the Complaint, *pro se*, without counsel.

In November, plaintiff gave a very lengthy deposition. On December 18, 1969, a prominent and well-qualified member of the Bar of this Court filed an appearance for the plaintiff. Counsel proceeded with discovery including depositions of witnesses and defendants, interrogatories and motions.

In December, 1970, that attorney applied to the Court to be relieved as counsel. This was allowed without objection.

Defendants then filed, on December 16, 1970, a motion for summary judgment under Rule 56. In accordance with the Local Rules of this Court that motion was accompanied by Proposed Findings of Fact and a Brief, all of which were served upon the plaintiff through the mails with return receipt required.

The Local Rules of this Court allow ten (10) days to respond to such a motion (Rule 8). No response has ever been filed by plaintiff.

The case was set for a pretrial hearing on January 7, 1971. At that time, the plaintiff appeared personally with another member of the Bar of this Court. Plaintiff and counsel stated to the Court that plaintiff had received the Motion for Summary Judgment and Brief and that they were delivered to counsel the next day after receipt. Counsel requested a continuance of the pretrial hearing for consideration of the motion. Both counsel and plaintiff stated to the Court that counsel, though not of record originally, had advised and counseled plaintiff in regard to the lawsuit even prior to the filing of the Complaint. Defendants objected to a continuance.

The Court exercised its discretion in favor of plaintiff and continued the hearing until January 19, 1971. On that date the plaintiff and his counsel appeared. No response to the Motion for Summary Judgment was submitted, but counsel did orally argue in opposition to the Motion for Summary Judgment.

That motion is now before the Court for consideration.

■ Mere allegations in the pleadings are not sufficient to withstand a Motion for Summary Judgment based upon evidence in the record. Scarboro v. Universal C.I.T. Credit Corp., 5th Cir. 1966, 364 F.2d 10.

The defendants' motion raises the following questions for the Court's consideration:

(1) Is the plaintiff a "public figure"?

(2) Was the publication knowingly false and maliciously made?

The protections afforded by libel and slander statutes have collided with the constitutional protections of free speech afforded by the First Amendment. The Supreme Court in New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1963) drove the first wedge of exemption into the libel bulwark. There the Court excluded claims of falsehoods relating to "public officials," unless the falsehood was made with "actual malice."

Subsequent cases have extended this principle to include matters of great public concern. Time, Inc. v. Hill, 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456, (1967); Garrison v. Louisiana, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964); Greenbelt Cooperative Publishing Association v. Bresler, 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970). Later, in a case originating in this district, the principle was expanded to include "public figures." Curtis Publishing Company v. Butts, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967).

■ Counsel for both sides have argued the question of whether the plaintiff was a "public figure." The facts in evidence including the testimony of the plaintiff would lead the Court to the conclusion that the plaintiff is a "public figure." He is the author of a book published in both English and French. He has written for several national publications. He declares himself to be a lecturer and public speaker and an originator of several well-known civil rights slogans. By his own statements, the plaintiff considers himself a "national figure" and spent "three years in building a national reputation." The plaintiff considered himself a "public figure" in the community and the country.

The Court went further to state in Butts, supra, on page 164, 87 S.Ct. page 1996, that "many [individuals] who do not hold public office at the moment are nevertheless intimately involved in the resolution of important public questions or, by reason of their fame, shape events in areas of concern to society at large."

Thus, it was still left to the trial court or jury to determine who is or is not a "public figure."

There were numerous cases decided after Sullivan. Cf. "Actual Malice Standard to Defamation of Public Figures," 2 Ga.Law Rev. 393, 408–409 (Spring, 1968, No. 3). Although some of these cases, (See also Bon Air Hotel v. Time, Inc., 5th Cir., 1970, 426 F.2d 858, page 861 as to these examples) allowed recovery and others did not, only one or two out of the twenty-odd cases cited were decided in a period contemporaneous with or after Butts. Those decisions, then, cannot be great weight as to the "public figure" rule. Yet, they form a guideline when grouped together which, however hazy it may be, seems to indicate that the courts have looked to see if the plaintiffs were true public figures or actually involved in matters of public interest.

If plaintiff in the instant case is all that he claims to be then we have no hesitation in finding that persons of almost every color, creed, nationality and social status will have some interest in his views and actions whether they agree with the same or not.

Simply being an author or writer would not necessarily cause a person to be a public figure. But, in this case, plaintiff has written articles pertaining to topics of current and even controversial interest. He claims to have originated certain slogans such as "Black is beautiful and it is so beautiful to be black" and further claims to have origi-

nated and founded "The Black Pride Movement."

The Court could infer from the foregoing that plaintiff was a "public figure" in the sense of *Butts, supra,* and Associated Press v. Walker, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967). In addition to the foregoing, the plaintiff was, at the time of the "interview" a candidate for election to the Atlanta School Board.

This question was clearly answered by the Supreme Court on February 24, 1971, in Monitor Patriot Co. v. Roy, 401 U.S. 265, 91 S.Ct. 621, 28 L.Ed.2d 35. Justice Stewart speaking for the Court said:

> "The trial judge instructed the jury that Roy, as a candidate for elective public office, was a 'public official,' and that characterization has not been challenged here. Given the later cases, it might be preferable to categorize a candidate as a 'public figure,' if for no other reason than to avoid straining the common meaning of words. But the question is of no importance so far as the standard of liability in this case is concerned, for it is abundantly clear that, whichever term is applied, publications concerning candidates must be accorded at least as much protection under the First and Fourteenth Amendments as those concerning occupants of public office. That *New York Times* itself was intended to apply to candidates, in spite of the use of the more restricted 'public official' terminology, is readily apparent from the opinion's text and citations to case law. And if it be conceded that the First Amendment was 'fashioned to assure the unfettered interchange of ideas for the bringing about of political and social changes desired by the people,' Roth v. United States, 354 U.S. 476, 484, 77 S.Ct. 1304, 1308, 1 L.Ed.2d 1498, then it can hardly be doubted that the constitutional guaranty has its fullest and most urgent application precisely to the conduct of campaigns for political office."

Thus, this Court will follow the above case and holds that this plaintiff cannot recover unless there has been "actual malice" or the publishing of a knowing falsehood with reckless disregard of the truth. This brings the Court to the second question. Is there a dispute as to any material fact which could impute "malice."

The plaintiff contends that the article shows malice on its face. The Court cannot factually accept this contention.

Reference to the publication claimed to be libelous reflects that it all purports to be quotes of the plaintiff or comments on the "interview."

In oral argument to the Court, counsel for the plaintiff made the following points in support of their contention of "actual malice";

> (a) conversation at the beginning of the "interview" by plaintiff to defendant as to his national heritage.

> (b) defendant's attitude while in Los Angeles.

> (c) defendant's nervousness during the "interview."

The plaintiff cites the following discrepancies to support his position that the writer was unjournalistic and had a reckless disregard for the truth:

> (a) Use of initial "R" instead of "J" for plaintiff's name.

> (b) Use of Hunter Avenue instead of Hunter Street.

> (c) Reference to Atlanta's Vice-Mayor having graduated from law school at age 19 instead of college at age 19.

> (d) Use of word, "came" instead of "went."

> (e) Use of expression "Black Power" instead of "Black Pride" in referring to a movement claimed to have been initiated by plaintiff.

The errors claimed to have been made were insignificant when considered to be reported by a Bostonian about Atlanta and Atlantans.

Even the plaintiff could not make proper reference to "Black Pride." In

his deposition at page 38, he states that "here I am calling for black power." He has edited the deposition to read "black pride"; however, the Court Reporter transcribed "black power."[1]

The Court feels that this error of the plaintiff or reporter, whichever, would affirmatively operate to defendant's benefit to negate a reckless disregard for accuracy. If plaintiff made a slip of the tongue once, he could have done it previously. On the other hand, if the Court Reporter could not understand him, likewise others, including the defendant, could have the same difficulty.

The plaintiff alleges the following libelous statement in defendant's magazine:

"Jackson introduces himself as 'the first cultural psychiatrist in the United States. * * *.' "

However, plaintiff testified in his deposition in regard to the foregoing as follows:

"He said that I introduced myself as the first cultural psychiatrist in the country. I did introduce myself as the first cultural psychiatrist in the country."

The plaintiff alleges the following libelous statement in defendant's magazine:

"and guesses that we didn't know he was the source of 'Black Power' as a political slogan. He guesses right."

However, plaintiff testified in his deposition in regard to the foregoing as follows:

"And guesses that he didn't know that I—that he was—we didn't know that he was a source of black power. I did not tell him that. I did not tell him that. I told him that the black pride campaign was what I innovated * * * But he says that I told him black power * * *. I said black pride. Maybe it sounded like power to him."

The plaintiff alleges the following libelous statement in defendant's magazine:

"I see the basic problem of the black man in American as a mass neurosis."

However, plaintiff testified in his deposition in regard to the foregoing as follows:

"This isn't necessarily defaming. It might be, but it's not what I am angry about * * *. I told him that the problem of the black man in the country was the mass neurosis of the white man."

" * * * obviously it was misunderstood, but he chose to get it in there * * * here to me it looks like somebody getting into an area that he had no business making comments on one way or the other."

The plaintiff alleges the following libelous statement in defendant's magazine:

" * * * citing Wilhelm Reich as the source for his theories about the debilitating consequences of 'the suppression of the capacity for love.' "

However, plaintiff testified in his deposition in regard to the foregoing as follows:

" * * * that is fairly accurate."

The plaintiff alleges the following libelous statement in defendant's magazine:

"A satisfactory sexual climax, says Jackson, is the answer to mental health * * *."

However, plaintiff testified in his deposition in regard to the foregoing as follows:

"What I did say was that there is a group of psychiatrists in this country who—as Freud defines mental health, the ability to work, love, and function—also a group of psychiatrists, led by Wilhelm Reich, who de-

---

1. A review of the deposition of plaintiff reflects the most revised document the Court has ever observed. The plaintiff has changed hundreds of words and sentences and scores of pages have been re-written by him to the extent of completely changing the meaning of the original transcription.

fines mental health as ability to have a satisfying sexual climax."

The plaintiff alleges the following libelous statement in defendant's magazine:

"the key to good sex is 'powerfulness,' as opposed to 'powerlessness.'"

However, plaintiff testified in his deposition in regard to the foregoing as follows:

Q. "You are not objecting to that, are you? Those things you are not objecting to?

A. No. Powerfulness is probably a good condition and powerlessness is probably a bad condition, but—

Q. He didn't do you wrong on that, did he?

A. No, he didn't do me any real injury there one way or the other * * *"

The plaintiff alleges the following libelous statement in defendant's magazine:

"On George Washington: 'A thug, a traitor, a murderer, a slave holder, an uncivilized barbarian, a bastardizer.'"

However, plaintiff testified in his deposition in regard to the foregoing as follows:

"He [George Washington] was a murderer * * * from the point of view of his country, he was in truth a traitor, the highest form of crime.

"He was a slaveholder.

"we know slavery was an uncivilized and barbaric institution. That made George Washington, as a slaveholder, an uncivilized barbarian."

"I also called him a rapist."

"He was a rapist. At no point did I tell him these are my personal views. I told him these were my rational, not manic, but rational, logical conclusions, because when I made the statement, I told him and gave him an interpretation of what I meant at each word, at each word."

"At the point when I made the statement that George Washington was an adulterer, I said he was having sexual affairs with women who he was not married to. He was married to another woman. That made him an adulterer. When these women who he was not married to gave birth to children by him, that made him a bastardizer. That is the legal definition of a bastard, a child begat by a man married to one woman from the body of another. And I broke this down, not in a manic fashion but completely rational, making the correct inference from the assumed facts.

"If we assume the fact that George did have these affairs and that these women did become pregnant by him, then the rational conclusion is that he was a bastardizer."

The plaintiff alleges the following libelous statement in defendant's magazine:

"on the American flag: 'I consider the American flag toilet paper.'"

However, plaintiff testified in his deposition in regard to the foregoing as follows:

"And in pursuing that thought, take a look at the American flag, I said, if you are white Anglo-Saxon Protestant, upperclass * * * then the country, is a democratic country, land of opportunity, liberty, freedom, et cetera. The flag symbolizes, all this symbolizes security, symbolizes hope, symbolizes freedom, opportunity, good life, but if you are a little black pickaninny in the Mississippi Delta, you have been sleeping on a dirt floor and your sister was raped by a deputy sheriff and your mama went to see the sheriff about it and she was told not to be an uppity nigger—that's what fourteen year old black girls are for, sexual pleasure of the white man; ain't no such thing as a white man raping a negro; and little baby brother died last winter because he froze to death or because of malnutrition or starv-

ing, then the American flag is nothing more than toilet tissue to you.

"Now, I told him that this was my hypothetical pickaninny's point of view. Of course, from his point of view, maybe I am a pickaninny, I don't see myself as a pickaninny, see. If he identified me as a pickaninny in the article there by putting down that I said this, that is his article, not mine. I don't identify with a pickaninny any more than I identify with a white man or his upperclass."

■ The Court thus finds that the defendant has admitted the substantial portion of the quotes attributed to him and has admitted the possibility of misunderstanding as to others. This could easily be the situation when reporting briefly on a monologue that extended over such a lengthy period.

Following the reasoning of the Court in Time, Inc. v. Pope, 401 U.S. 279, 91 S.Ct. 633, 28 L.Ed.2d 45, decided February 24, 1971, we can extend the protection of the First and Fourteenth Amendments to the instant situation. In referring to the standard established in *New York Times, supra,* the Court in *Time, Inc., supra,* said:

"These considerations apply with even greater force to the situation where the alleged libel consists in the claimed misinterpretation of the gist of a lengthy government document. Where the document reported on is so ambiguous as this one was, it is hard to imagine a test of "truth" that would not put the publisher virtually at the mercy of the unguided discretion of a jury.

In certain areas of the law of defamation, *New York Times* added to the tort law of the individual States a constitutional zone of protection for errors of fact caused by negligence. The publisher who maintains a standard of care such as to avoid knowing falsehood or reckless disregard of the truth is thereby given assurance that those errors that nonetheless occur will not lay him open to an indeterminable financial liability. * * *"

In St. Amant v. Thompson, 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968), the Court said:

"Our cases * * * have furnished meaningful guidance for the further definition of a reckless publication. In *New York Times, supra,* the plaintiff did not satisfy his burden because the record failed to show that the publisher was aware of the likelihood that he was circulating false information. In Garrison v. State of Louisiana, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964) * * * the opinion emphasized the necessity for a showing that a false publication was made with a 'high degree of awareness of * * * probable falsity.' 379 U.S., at 74, 85 S.Ct., at 216. * * * These cases are clear that reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice."

The defendant went on to conclude in the article about the plaintiff, which claims as libelous, the following:

"Later, Dale wants to know what I think of Doctor Jackson. I say I think he is a dangerous man, who needs hate to fortify his own faltering sense of adequacy. She says he's running for election to the Atlanta School Board. As if Atlanta didn't have enough problems."

If the other material is protected, this last statement would appear to be fair comment. It would be fair journalistic license based on previous reporting.

The Court finds that there is no dispute as to any material fact that would raise an issue of actual malice by a

knowing or reckless disregard of the truth.

As stated by the Court in Monitor Patriot Co. v. Roy, *supra,* the outer limits of this test will be marked out through case-by-case adjudication.

Certainly the reporting of the "interview" and fair comment thereon as presented in this case on a candidate for a School Board post is relevant.

If freedom of expression is to survive, certainly comments of the nature reported by the defendants here must receive the protection of the First and Fourteenth Amendments.

For the reasons stated, and without ruling on other grounds raised by the defendants, the Motion for Summary Judgment is granted in favor of the defendants.