DELMER TAYLOR v. GREENSBORO NEWS COMPANY

No. 8118SC986

(Filed 1 June 1982)

**Libel and Slander § 16— political candidate reported as having served prison term — summary judgment for newspaper proper**

In an action in which plaintiff, a candidate for State Senate, had been inaccurately reported as having served a prison term by defendant newspaper, summary judgment for defendant was properly entered where plaintiff, as a candidate for public office, was a public figure, and where the evidence failed

to show either "actual malice" or actual knowledge of falsity, reckless disregard for the truth, or a high degree of awareness of probable falsity.

APPEAL by plaintiff from *Collier, Judge.* Order entered 18 June 1981 in Superior Court, GUILFORD County. Heard in the Court of Appeals 30 April 1982.

Plaintiff brought this defamation action against defendant, alleging that an article published in the 26 April 1978 *Greensboro Daily News* contained a statement about plaintiff, then a candidate for public office, which was false and libelous *per se.* After the pleadings were joined, plaintiff took interrogatories of defendant. Defendant then filed a motion for summary judgment which was supported by affidavits. Plaintiff also moved for summary judgment, and filed an affidavit in support of his motion. Prior to hearing on the parties' motions for summary judgment, plaintiff and defendant stipulated to the facts of the case, only for the purposes of these motions. The facts are best summarized by reproducing in full the parties' stipulations, as follows:

STIPULATED FACTS (Filed June 18, 1981)

The facts in this case, only for the purpose of this motion for summary judgment, are hereby stipulated by the parties. The pleadings, interrogatory answers, affidavits and Delmer Taylor's deposition show:

1. On June 9, 1971, in the United States District Court in Greensboro, North Carolina, before Judge Edwin Stanley, Delmer Taylor pled no contest to a charge of filing false income tax returns. He was sentenced on December 3, 1971, and ordered to pay a $5,000.00 fine, was sentenced to serve six months in federal prison and was ordered to report to the Federal Marshall on December 27, 1971. On December 9, 1971, the Court ordered the sentence theretofore entered to be stricken and ordered that Delmer Taylor's sentence be suspended and that he be placed on probation in view of the fact that he had paid all back taxes and penalties to the Internal Revenue Service and had paid the $5,000.00 fine. The entry of the judgments by Judge Stanley on December 3, 1971 and December 9, 1971 were made in open court and were reflected in the Court files docket sheet as part of the

public record on file in the office of the Clerk of the United States District Court in Greensboro, North Carolina.

2. The Greensboro Record and the Greensboro Daily News published brief reports of the sentencing. These 1971 stories (Exhibit 2 to the Hackney affidavit) were placed in the Greensboro News Company library clipping file.

3. The later action taken by Judge Stanley on December 9, 1971 in striking its December 3, 1971 judgment and placing Delmer Taylor on probation on certain conditions was not the subject of a news story, and was not in the Greensboro News Company library clipping file. Delmer Taylor did not serve any time in prison.

4. In or about February, 1978, Delmer Taylor filed as a candidate in the Democratic primary for the North Carolina State Senate. He was a candidate for public office at all times pertinent to the alleged libel in this case.

5. On Friday afternoon, 21 April 1978, there was published in the Greensboro Record an editorial written by William Cheshire, entitled, "For the General Assembly," in which it was commented: "Delmer Taylor's campaign is not enhanced any by the six months he served in federal prison for tax evasion." The source of Mr. Cheshire's information was the clipping file on Delmer Taylor in the Greensboro News Company library. Unknown to Mr. Cheshire, the observation that Mr. Taylor had served time was incorrect.

6. Mr. Cheshire was employed as editorial page editor of The Greensboro Record from January 13, 1975 until April 31, 1978, when he resigned to accept a job as editor of the Charleston Daily Mail, Charleston, West Virginia. At all times pertinent to this case, he was employed in the capacity of editorial page editor of the Record. He had no responsibility for the Daily News, including Daily News reporters or news staff.

7. Following publication of the Record editorial, Mr. Cheshire received a telephone call from Ogden Deal on that Friday night, 21 April. Mr. Deal, [sic] told Mr. Cheshire it was his understanding or belief that Delmer Taylor had not been in prison. Mr. Cheshire told Mr. Deal he had evidence to the

contrary. Mr. Deal furnished no additional information to Mr. Cheshire other than his statement that he understood or believed Delmer Taylor had not been in prison.

8. On Saturday, 22 April 1978, Delmer Taylor telephoned Mr. Cheshire at his home and denied that he had ever been in prison, requesting a retraction by Mr. Cheshire, but furnishing no additional information to Mr. Cheshire. Mr. Cheshire replied that he had information to the contrary and would not retract his article. Mr. Taylor repeated his denial, but gave no facts beyond the general denial.*

9. Mr. Cheshire received no information that caused him to change his belief in the accuracy of his statement concerning Delmer Taylor having spent time in prison. He did not bring the telephone calls to anyone else's attention. He did not then check the Court file on Delmer Taylor in the Office of the Clerk of United States District Court in Greensboro, North Carolina.

10. On Tuesday, 25 April 1978, Mr. Taylor began running radio spots on WBIG, WCOG and WEAL. These were general advertisements for his campaign, but they included at the end a statement by his wife, Virginia Taylor, denying that Delmer Taylor had ever spent time in prison. No further information was given. The full text of the radio commercials (they were the same on all three stations) is attached to Mr. Taylor's deposition as Exhibit 6. The commercials ran for one week, beginning April 25.

11. Also on Tuesday, 25 April 1978, Mr. Taylor placed advertising with Greensboro News Company, asking that the advertising be run immediately in both the Daily News and the Record; however, due to the usual scheduling delays the advertising could not commence running until 28 April 1978, which commencement date was reflected in the contract of 25 April 1978. The ads contained an insert at the bottom denying that Delmer Taylor had never [sic] been in prison, and "defying" the Record to prove that he had. The ads did com-

---

* Although Mr. Cheshire recalls the telephone call from Ogden Deal, he has no recollection of the Taylor call. Nevertheless, for purposes of this summary judgment motion we presume it to be true.

mence running on 28 April 1978 in accordance with the terms of the contract of 25 April 1978.

12. The Greensboro News Company advertising department does not customarily or ordinarily communicate or correspond with the Greensboro Daily News staff, and the contents of Delmer Taylor's ad were not communicated to the Greensboro Daily News staff.

13. At all times pertinent to this controversy, Brent Hackney was a reporter for the Greensboro Daily News. He did not answer to the editorial page staff of The Greensboro Record, including Mr. William Cheshire, or to the Greensboro News Company advertising department.

14. On Tuesday, 25 April 1978, Mr. Hackney worked on the Daily News article, to be published the following day, entitled "County Politics Changed" (attached to the Hackney affidavit as Exhibit 1). He did not hear or hear about Delmer Taylor's radio commercial, which began running that day. Upon arriving at work, Mr. Hackney spent the day in the office working on articles, largely including the county politics article which was to run the next day.

15. Mr. Hackney's story, which ran on Wednesday, 26 April 1978, contained on the third page this comment about Delmer Taylor: "Taylor, founder and former president of Delta Plating Co., served a brief federal prison sentence in 1972 after pleading no-contest to filing false income tax returns." That statement was incorrect.

16. Mr. Hackney had read the 21 April 1978 Record editorial by Mr. Cheshire, but he never knew, prior to publication of his own article on 26 April, that anyone had denied to Mr. Cheshire the accuracy of the Cheshire editorial. In preparing his story, he checked the Greensboro News Company library clipping file concerning Mr. Taylor, where he found the 1971 news stories reporting Mr. Taylor's original conviction and sentencing to six months in prison. These 1971 articles were the source for Mr. Hackney's comment about Mr. Taylor's prison time. When his story was published on 26 April 1978, Mr. Hackney did not know his comment was incorrect, and he did not know Mr. Taylor or

anyone else had ever denied to any person or in any way that Mr. Taylor had in fact served time. At no time prior to the printing of his article on 26 April 1978 did Mr. Hackney check the Court file on Delmer Taylor in the office of the Clerk of the United States District Court in Greensboro, North Carolina.

17. On the same day the Daily News article was published (26 April 1978), a Record reporter, Jim Schlosser, telephoned Delmer Taylor stating he had heard the radio ads of Mr. Taylor's and asked him about the story concerning his having been in prison. Mr. Taylor denied the story about having served time in prison.

18. On 26 April 1978, Mr. Cheshire did check the Court files. He saw the record of the ultimate striking of Mr. Taylor's sentence and the new suspended sentence, whereupon he prepared a correction to his original editorial and had it published in that afternoon's Record (Cheshire affidavit, Exhibit 2). On that same day, Mr. Hackney learned of his error based on someone's review of the records at the United States District Courthouse in Greensboro, and he prepared a correction which was run in the next edition of the Daily News (27 April 1978) (Hackney affidavit, Exhibit 3).

19. At the times pertinent to this case (the month of April, 1978), The Greensboro Record and the Greensboro Daily News were entirely separate as to their news and editorial functions. They shared only the advertising, circulation, production and business and accounting departments and library files. These departments had nothing to do with the preparation or review of editorials or news stories, and specifically had nothing to do with Mr. Hackney's Daily News story involving Delmer Taylor.

20. The staffers of the editorial departments of the two newspapers occupied separate offices. The editorial page editors (Mr. Cheshire, from the Record) operated independently of each other, and independently from the reporters and news staffs of both papers.

21. The reporters and news staffs of both newspapers worked under separate supervision, independently from each

other, and independently from the editorial departments of both papers. The Record and Daily News reporters had desks at opposite ends of the same large room at Greensboro News Company, separated by a number of desks with video display terminals, used by the copy editing staffs, in the center of the room.

22. Specifically as to Mr. Hackney's Daily News article, the chain of involvement with and responsibility for that article, from its inception through its publication was:

a. The article was written by Mr. Hackney on 25 April 1978;

b. It was reviewed the same day by his immediate supervisor, Mr. Nat Walker, city-state editor for the Greensboro Daily News;

c. The article then went to Mr. Darwin Honeycutt, copy editor responsible for layout for the Greensboro Daily News on the same day, for a review for purposes of determining where on the assigned page of the newspaper the article should be placed;

d. It would then have been reviewed by a copy editor on the same day, whose function was to prepare a headline, and to review the article for grammatical errors and the like. Defendant cannot determine who the copy editor would have been.

e. Typically, the article would then go to Mr. Hubert Breeze, who was chief of the copy desk. Mr. Breeze was on vacation, however, and if the article was reviewed at that level, it would have gone to his stand-in, Mr. George Hord, for an overall review.

f. Finally, the article was reviewed on the same day by Mr. Henry Coble, Assistant Managing Editor of the Greensboro Daily News. Mr. Coble was the last person who reviewed the article before it went to press. It then went through the process of typesetting and printing for the next morning's newspaper.

All of these men were on the Greensboro Daily News staff. They did not work for, they were not responsible for,

and they were not answerable to the Record, None [sic] of them knew that any part of the Daily News story involving Delmer Taylor was incorrect. None of them knew that Delmer Taylor had denied that he spent time in prison. None were responsible for or answerable to Mr. Cheshire, the editorial page editor of the Record. None had heard from any source — Mr. Cheshire, the radio, or otherwise — that Delmer Taylor had denied the Record editorial. None knew that Delmer Taylor had placed any advertising copy with the Greensboro News Company advertising department. As members of the Greensboro Daily News news staff, they maintained an independence from the advertising function of the paper, and they did not, either customarily or on this occasion, communicate with the advertising department regarding news stories or advertising copy.

From Judge Collier's order granting defendant's motion for summary judgment and denying plaintiff's motion for summary judgment, plaintiff appeals.

*Anne R. Littlejohn, for plaintiff-appellant.*

*Smith, Moore, Smith, Schell & Hunter, by Richard W. Ellis and Alan W. Duncan, for defendant-appellee.*

WELLS, Judge.

The dispositive question before us is whether defendant's G.S. 1A-1, Rule 56(c) motion was properly granted. In its recent decision in *Lowe v. Bradford,* --- N.C. ---, 289 S.E.2d 363 (1982), our Supreme Court reiterated the rules regarding the burden of proof upon a motion for summary judgment, as follows:

> A party moving for summary judgment may prevail if it meets the burden (1) of proving an essential element of the opposing party's claim is nonexistent, or (2) of showing through discovery that the opposing party cannot produce evidence to support an essential element of his or her claim. *Moore v. Fieldcrest Mills, Inc.,* 296 N.C. 467, 251 S.E. 2d 419 (1979); *Zimmerman v. Hogg & Allen,* 286 N.C. 24, 209 S.E. 2d 795 (1974). Generally this means that on "undisputed aspects of the opposing evidential forecast," where there is no genuine issue of fact, the moving party is entitled to judgment

as a matter of law. 2 McIntosh, *North Carolina Practice and Procedure* § 1660.5, at 73 (2d ed. Supp. 1970) . . . . .

If the moving party satisfies its burden of proof, then the burden shifts to the non-moving party to "set forth *specific facts* showing that there is a genuine issue for trial." Rule 56(e), Rules of Civil Procedure (emphasis added). The non-moving party "may not rest upon the mere allegations of his pleadings." *Id.*

Within these well-established rules of procedural law, we now turn to the substantive law of defamation. In the seminal case of *New York Times Co. v. Sullivan*, 376 U.S. 254, 11 L.Ed.2d 686, 84 S.Ct. 710 (1964), a Montgomery, Alabama City Commissioner whose official duties included supervising the Montgomery Police Department, brought a civil libel action against defendant, alleging that the *New York Times* had published an advertisement which contained false allegations of brutal conduct by the Montgomery police against civil rights activists. Although Sullivan's name was not specifically mentioned in the advertisement, he contended that the libel had in fact damaged his professional reputation. Weighing the right of an individual not to be libeled against the First Amendment's protection of freedom of the press, especially in light of the public's right of vigorous debate as to the conduct of public officials in the performance of their duties, the Supreme Court held:

The constitutional guarantees require, we think, a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct *unless he proves that the statement was made with "actual malice"—that is, with knowledge that it was false or with reckless disregard of whether it was false or not.* (Emphasis added).

Later cases have shown that this basic approach is not limited to public officers or to the performance of official duties, or even to conventional civil libel suits. *See* Annot., 20 A.L.R.3d 988. In *Garrison v. Louisiana*, 379 U.S. 64, 13 L.Ed.2d 125, 85 S.Ct. 209 (1964), a district attorney was convicted for criminal libel of Louisiana state judges. The Supreme Court held that the rule applies equally to criminal and civil libel suits, and that "The New York Times rule is not rendered inapplicable merely because an

official's private reputation, as well as his public reputation, is harmed."

In *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 18 L.Ed. 2d 1094, 87 S.Ct. 1975 (1967), *reh. denied*, 389 U.S. 889, 19 L.Ed. 2d 197, 198, 88 S.Ct. 11, 12 (1967), the Supreme Court extended the application of the *New York Times* rule to include "public figures" as well as public officials. Plaintiff Butts, a well-known football coach and university athletic director, was accused in a newspaper article of "fixing" the outcome of a football game. Plaintiff Walker, a politically prominent private citizen, was alleged to have encouraged the use of violence during a race riot at the University of Mississippi. The Court characterized those plaintiffs as public figures because:

> [B]oth Butts and Walker commanded a substantial amount of public interest at the time of the publications; both, in our opinion, would have been labeled "public figures" under ordinary tort rules. (Citation omitted). Butts may have attained that status by position alone and Walker by his purposeful activity amounting to a thrusting of his personality into the "vortex" of an important public controversy, but both commanded sufficient continuing public interest and had sufficient access to the means of counterargument to be able "to expose through discussion the falsehood and fallacies" of the defamatory statements.

In *Beckley Newspapers Corp. v. Hanks*, 389 U.S. 81, 19 L.Ed. 2d 248, 88 S.Ct. 197 (1967), a Clerk of Court alleged that he was libeled in editorials published during his reelection campaign which criticized his official conduct, and again, the Supreme Court applied the *New York Times* rule.

Finally, in *Patriot Co. v. Roy*, 401 U.S. 265, 28 L.Ed. 2d 35, 91 S.Ct. 621 (1971), defendant published a column referring to plaintiff, a candidate in the New Hampshire Democratic Party primary for the U.S. Senate, as a "former small-time bootlegger." The Court stated that it was unnecessary to characterize plaintiff as either a public figure or a public official, since, "That New York Times itself was intended to apply to candidates, in spite of the use of the more restricted "public official" terminology, is readily apparent from that opinion's text and citations to case law."

Given such precedent, we find that at the time of this incident, the *New York Times* standard of liability clearly applied to plaintiff, a candidate for public office. *See Patriot Co. v. Roy*, supra.

Our next level of inquiry is whether the materials before the trial court conclusively show that plaintiff would be unable to produce evidence of "actual malice" at trial, entitling defendant to summary judgment. Plaintiff relies on the case of *Hall v. Publishing Co.*, 46 N.C. App. 760, 266 S.E.2d 397 (1980), to support his argument that summary judgment for defendant was improperly granted. However, the stipulations of facts in this case distinguish it from *Hall*, supra.

Under the "actual malice" test, a prevailing plaintiff must prove, by clear and convincing evidence, that the false statement was made with either actual knowledge of falsity, reckless disregard for the truth, or a high degree of awareness of probable falsity. *Gertz v. Welch*, 418 U.S. 323, 41 L.Ed.2d 789, 94 S.Ct. 2997 (1974); *Garrison v. Louisiana*, supra; *St. Amant v. Thompson*, 390 U.S. 727, 20 L.Ed.2d 262, 88 S.Ct. 1323 (1968). Applying the "actual knowledge of falsity" test, Stipulations of fact 14 and 16 make it clear that reporter Brent Hackney did not know that plaintiff had never served time in prison. According to Stipulation 22, no one with management authority over the article knew that the statement was incorrect. Under the "reckless disregard for the truth" basis for liability, Stipulations 3, 14, 16 and 22 show that Hackney and his editors at the *Greensboro Daily News* had not learned from any source that plaintiff's sentence had been modified or that plaintiff had not served time in prison. Thus, it appears that plaintiff relies on the "high degree of awareness of probable falsity" standard, arguing that the close relationship between the *Greensboro Record* and the *Greensboro Daily News* implies that actual notice to the *Record* also constitutes constructive notice to the *Daily News*. Stipulations 12, 13, 19, 20, 21 and 22 show that the *Greensboro Record* and the *Greensboro Daily News* are separate entities, independent of each other in reporting and editing, and further, that their joint advertising department does not customarily, and did not on this occasion, communicate with the news staff about the content of advertising copy. Thus, there is no basis in fact to support an inference of constructive notice to the *Daily News*.

American Travel Corp. v. Central Carolina Bank

Given such stipulated facts, we are persuaded that defendant has shown that an essential element of plaintiff's claim, *actual malice* by defendant, is nonexistent, and that defendant is entitled to judgment as a matter of law. *See Lowe v. Bradford*, supra.

For the reasons previously stated, we also find that the trial court properly denied plaintiff's motion for summary judgment.

The order of the trial court must be and is

Affirmed.

Judges WEBB and WHICHARD concur.