RANSOM COUNTY FARMERS PRESS, et al., Appellants, v. THE LISBON FREE PRESS, et al., Respondents.

(194 N. W. 892.)

**Elections — corrupt practice act construed as to what elections it is applicable.**

  1. The Corrupt Practice Act (Comp. Laws 1913, §§ 923–944) applies to all primary and general elections held in the state; but the language of the act indicates that the legislature intended that certain provisions should be applica-

ble only to elections of public officers, while other provisions should be applicable alike to elections of officers and elections involving some measure, proposition or question submitted at an election.

**Elections — corrupt practice act ground of contest.**

2. Where a candidate for public office, receiving the highest number of votes at the election, has been guilty of corrupt practice, any person claiming the right to the office may contest the validity of such election under §§ 1046 and 1048, Comp. Laws 1913, and assert such corrupt practice as a ground of contest.

**Elections — action in equity to annul election will not lie where contest lies under statute.**

3. In all cases, where under the statute, such contest lies an action in equity to annul the election will not lie. Whether such action will. lie under any circumstances is not decided.

Opinion filed August 6, 1923.

Election, 20 C. J. § 226 p. 184 n. 32 New, p. 186 n. 66 New; § 274 p. 217 n. 47 New; § 275 p. 217 n. 53 New; § 284 p. 223 n. 33.

Appeal from the District Court of Ransom County, *Allen*, J.
Plaintiffs appeal from an order sustaining a demurrer.
Affirmed.

*Pierce, Tenneson, Cupler & Stambaugh,* for appellants.

"There is much to support this contention. Had Totten in any manner imagined his offer would be construed as a bribe to the voters, he would not have made it, but nevertheless we cannot accept his interpretation of his language. While the amount involved is small, to approve it would utterly defeat the purposes of the corrupt practice act. . . . The corrupt practice act should be liberally construed with the view to its enforcement for the public interest and the purity of elections. Nelson v. Gass, 27 N. D. 357, 146 N. W. 537, Ann. Cas. 1915C, 796. This has been the holding of other states under statutes similar to our own." Diehl v. Totten, 32 N. D. 131, 155 N. W. 74, Ann. Cas. 1918A, 884; Kunder v. Madison (S. D.) 162 N. W. 898; note to L.R.A.1917B, p. 191; 20 C. J. pp. 185, 188; 9 R. C. L. p. 1180.

"The Corrupt Practice Act should be liberally construed with a view to its enforcement for the public interest and the purity of election." Diehl v. Totten, 32 N. D. 131, 155 N. W. 74, Ann. Cas. 1918A, 884.

"The term public office implies an authority to exercise some portion of the sovereign power of the state, either in making, administering or executing laws." State ex rel. McArthur v. McLean, 35 N. D. 216; 29 Cyc. pp. 1361, 1362; State v. Spaulding (Iowa) 72 N. W. 288; note to 63 Am. St. Rep. 187–192.

"While it is not true that every service or duty prescribed by statute constitutes an office, still such statutory provisions concerning a public employment, especially if the duties be of a general nature, are generally sufficient to determine the employment an office." 63 Am. St. Rep. 188 and cases.

"An office is a public charge or employment and the term comprehends every charge or employment in which the public is interested." Michael v. State, 162 Ala. 425, 50 So. 929.

"He who performs the duties of an office is an officer." Com. v. Bush, 131 Ky. 384, 115 S. W. 239.

"An office is a legal entity and may exist though it be without an incumbent." Childs v. State (Okla.) 113 Pac. 545, 33 L.R.A.(N.S.) 563.

The district court "has power to determine all controversies or questions of difference which can possibly be made the subject of civil action." Trott v. State. 41 N. D. 614, 171 N. W. 827 (Colo.) 130 Pac. 618; Shaw v. Circuit Ct. (S. D.) 129 N. W. 907.

*Kvello & Adams,* for respondents.

"In this state title to a county office may be tried either by the statutory mode of contest; or by a civil action in the nature of quo warranto." State v. Callahan, 4 N. D. 481.

The almost universal rule is that equity does not intervene to try the right of the title to public office. 20 C. J. Elections, 216, § 274; 9 R. C. L. Elections, § 143; 42 Am. St. Rep. 234 (note); Ann. Cas. 1912C, 191, note; 4 Pom. Eq. Jur. 4th ed. § 1756.

"Appellant instituted this contest . . . to have said election *declared void,*" which is only another way of saying that it was a proceeding "to annul and set aside an election." Kunder v. Madison, 162 N. W. 898; Saari v. Gleason, 148 N. W. 293.

"The rule is quite general that equity will not intervene when an adequate remedy is offered at law, and hence in controversies involving the right to an office the injunction will not usually lie, because the

parties have a complete remedy by statute to contest an election or by quo warranto to determine the right resulting therefrom. Where, however, an election relates to the adoption or rejection of some local question and does not include an office it has been held in some jurisdictions, in the absence of another statute authorizing such proceedings, that equity would intervene to determine a contested election because of irregularities or fraud in the conduct thereof." Marsden v. Harlocker (Or.) 120 Am. St. Rep. 786.

It is of the nature of an office that the person exercising its functions or performing its duties should be appointed or elected in accordance with law. See 63 Am. St. Rep. 190.

Per Curiam. The controversy presented on this appeal involves the validity of the election of the official newspaper of Ransom county.. The Enderlin Independent and the Lisbon Free Press both aspired to become the official newspaper of Ransom county, and their names were placed upon the official ballot to be voted at the general election held in November 1922, as applicants or candidates for official newspaper of Ransom County. The Enderlin Independent is a newspaper published by the plaintiff Ransom County Farmers Press, a corporation. The county canvassing board found and duly declared that the Lisbon Free Press had received the highest number of votes cast at the election. After the announcement of the result of the election by the canvassing board, this action was instituted by the Ransom County Farmers Press, a corporation, and one Bangert, secretary of said corporation to annul the election.

The complaint alleges that prior to the election the publisher of the Lisbon Free Press published a statement to the effect that in the event such newspaper was chosen the official newspaper of the county "it promises to put before every voter in Ransom county a copy of the issues containing the delinquent tax list." Plaintiffs aver that this constituted a promise by a candidate for public office to give a valuable thing to an elector with the intent to induce him to vote for such candidate for a public office, and consequently constituted "a violation of the Corrupt Practice Act of the state of North Dakota, invalidating and annulling said election." And they pray judgment:

(1) "That said election of official newspaper be annulled and set

aside by the decree of this court for violation of the Corrupt Practice Act of the state of North Dakota" by reason of the acts of the defendant;"

(2) That it be adjudged that said Lisbon Free Press is not entitled to the office of official newspaper of said Ransom county; and that pending the action the defendant newspaper be enjoined from qualifying or attempting to qualify, and that the county auditor be enjoined from delivering to it the said certificate of election;

(3) That the Enderlin Independent be adjudged the duly elected and qualified newspaper of Ransom county;

(4) For general equitable relief.

The defendants demurred to the complaint on the ground, among others, that it did not state facts sufficient to constitute a cause of action. The trial court sustained the demurrer, and plaintiffs have appealed. Plaintiffs contend that the promise contained in the statement published by the publisher of the Lisbon Free Press is violative of, and that the Lisbon Free Press should be deprived of the benefit of the election under, the following provisions of the Corrupt Practice Act:

"Any person shall be guilty of corrupt practice within the meaning of this article if he expends any money for election purposes contrary to the provisions of this statute, or if he is guilty of treating, undue influence, personation, or the giving or promising to give any money or valuable thing to an elector with the intent to induce him to vote or to refrain from voting for any candidate for public office." Comp. Laws 1913, § 935.

"If upon the trial of any action or proceeding under the provisions of this article for the contesting of the right of any person declared to be nominated to any office or elected to any office, or to annul or set aside such election, or to remove any person from his office, it shall appear that such person was guilty of any corrupt practice, illegal act, or undue influence in or about such nomination or election, he shall be punished by being deprived of the nomination or office as the case may be, and the vacancy therein shall be filled in the manner provided by law." Comp. Laws 1913, § 942.

Respondents contend that these provisions of the Corrupt Practice

Act apply only to elections in which natural persons are candidates for office, and have no application to elections where certain measures or propositions are submitted. Respondents further contend that in all cases where the validity of the election of a public officer of a county is involved, an opposing candidate or any other elector of the county may contest the election; and, hence, an equitable action will in no event lie to determine the validity of the election.

The Corrupt Practice Act (chap. 129, Laws of 1911, as amended by chapters 157, 226 and 227, Laws 1913; §§ 923–944, Comp. Laws 1913) provides:

"No sum of money shall be paid, and no expenses authorized or incurred by or on behalf of any candidate to be paid by him, except such as he may pay to the state for printing, as herein provided, in his campaign for nomination to any public office or position in this state, in excess of fifteen (15) per cent of a year's compensation or salary of the office for which he is a candidate; provided, that no candidate shall be restricted to less than two hundred dollars ($200) in his campaign for such nomination; provided, that the provisions of this article shall not be construed to apply to the candidate's personal traveling expenses. . . ." Comp. Laws 1913, § 923.

Section 2 relates to candidates' statement in publicity pamphlet. Comp. Laws 1913, § 924.

Section 3 specifies rates to be charged the candidates for the various state, district and county offices for publication of statements in the publicity pamphlet. Comp. Laws 1913, § 925.

Section 4 relates to the preparation and printing of the publicity pamphlet by the secretary of state. Comp. Laws 1913, § 926.

Section 5 provides for the preparation of lists of voters by the county auditors of the several counties, and the mailing of a copy of the publicity pamphlet to each voter in the state. Comp. Laws 1913, § 927.

Section 6. "No sum of money shall be paid and no expenses authorized or incurred by or on behalf of any candidate who has received the nomination to any public office or position in this state, except such as he may contribute toward payment for his political party's or independent statement in the pamphlet herein provided for, in excess of fifteen (15) per cent of the annual salary of the office for which he is

nominated; provided, that no candidate shall be restricted to less than two hundred dollars." Comp. Laws 1913, § 928.

Section 7. "Every candidate for nomination or election to public office, including the offices of Senators of the United States, shall within fifteen (15) days after the primary or general election at which he was a candidate, file . . . an itemized statement setting forth in detail all the moneys contributed, expended or promised by him to aid and promote his nomination or election, or both. . . ." Comp. Laws 1913, § 929.

Section 8 provides that moneys shall not be contributed or received in connection with a nomination or election, in any other name than that of the person who in truth supplies the moneys contributed. Comp. Laws, 1913, § 930.

Section 9. "No person shall, in order to aid or promote his nomination or election, directly or indirectly promise to appoint another person or to secure or aid in securing the appointment, nomination or election of another person to any public or private position or employment, or to any position of honor, trust or emolument." Comp. Laws 1913, § 931.

Section 10. "No person shall demand, solicit, ask or invite any payment or contribution for any religious, charitable or other such cause from any person who seeks to be, or has been, nominated to any office, and no such candidate shall make any such payment or contribution, or promise or agree to make the same, if it shall be demanded or asked during the time he is a candidate for nomination or election. . . ." Comp. Laws 1913, § 932.

Section 11. "No corporation, trustee or officer thereof as such, shall pay or contribute in order to aid, promote or prevent the nomination or election of any person, or in order to aid or promote the interest, success or defeat of any person or any political party or organization. And no person shall solicit or receive such payment from any corporation." Comp. Laws 1913, § 933.

Section 12. "Any person or candidate who shall, either by himself or by any other person, either before or after election, or while such person or candidate is seeking a nomination or election, directly or indirectly, give or provide, or pay, wholly or in part, the expense of giv-

ing or providing any drink or intoxicating liquors to or for any person for the purpose or with the intent or hope to influence that person or any other person to give or refrain from giving his vote at such election to or for any candidate or political party ticket *or measure* before the people, or on account of such person or any other person having voted or refrained from voting for any candidate or the candidates of any political party or organization or measure before the people or being about to vote or refrain from voting at such election, shall be guilty of treating. . . ." Comp. Laws 1913, § 934.

Section 13. "Any person shall be guilty of corrupt practice within the meaning of this act if he expends any money for election purposes contrary to the provisions of this statute, or if he is guilty of treating, undue influence, personation, or the giving or promising to give any money or valuable thing to an elector with the intent to induce him to vote or to refrain from voting for any candidate for public office." Comp. Laws 1913, § 935.

Section 14 makes it unlawful to pay any person for attendance at the polls or to furnish transportation to voters. Comp. Laws 1913, § 936.

Section 15. "No publisher of a newspaper or other periodical shall insert either in its advertising or reading columns or any paid matter which is designed or tends to aid, injure or defeat any candidate or political party or organization or *measure* before the people, unless it is stated therein that it is a paid advertisement. No person shall pay the owner, editor, publisher or agent of any newspaper or other periodical to induce him to editorially advocate or oppose any candidate for nomination or election, and no such owner, editor, publisher, or agent shall accept such payment. Any person who shall violate any of the provisions of this section shall be punished for a corrupt practice." Comp. Laws 1913, § 937.

Section 16 makes it unlawful for any person on any election day, "to ask, solicit, or in any manner try to induce or persuade any voter on such election day to vote or refrain from voting for any candidate, or the candidates or ticket of any political party or organization, or any *measure* submitted to the people," and prescribes a penalty for a violation of this section. Comp. Laws 1913, § 939.

Section 17, provides that the name of a candidate shall not be printed on the official ballot at the general election unless he has filed a statement of his expenses as provided by the act.   Comp. Laws 1913, § 940.

Section 18. "It shall be unlawful for any ·person to accept, receive or refrain from becoming a candidate for nomination or election, or by himself or in combination with any other person or persons to become .a candidate for the purpose of defeating the nomination or election of .any person and not with a bona fide intent to obtain the office."   Comp. Laws 1913, § 941.

Section 19. "If upon the trial of any action or proceeding under the provisions of this act for the contesting of the right of any person ·declared to be nominated to any office or elected to any office, or to annul or set aside such election, or to remove any person from his office, it shall appear that such person was guilty of any corrupt practice, illegal act, or undue influence in or about such nomination or election, he shall be punished by being deprived of the nomination or ·office as the case may be, and the vacancy therein shall be filled in the manner provided by law."   Comp. Laws 1913, § 942.

Section 20. "Any action to contest the right of any person declared ·elected to any office, or to annul and set aside such election, or to remove from or deprive any person of an office to which he is the incumbent for any offense mentioned in this article must, unless a different time be stated, be commenced within forty (40) days after the return of the election at which such offense was committed. . . ."  ·Comp. Laws 1913, § 943.

Section 21. "Whoever violates any provision of this act, the punishment of which is not specifically provided by law, shall on conviction thereof be punished by imprisonment in the county jail for not more than six months, or by a fine of not more than one thousand dollars or by both such fine and imprisonment."   Comp. Laws 1913, § 944.

The Corrupt Practice Act was adopted in 1911.   Laws 1911, chap. 129, Comp. Laws 1913, §§ 923–925.   At the time of its enactment there was no provision for the selection of official newspapers at an election.   In fact, the same legislative assembly which enacted the Corrupt Practices Act, also, enacted a law imposing upon the county commissioners of each county in the state the duty to designate the

official newspaper of the county. Laws 1911, chap. 117. The law providing for the selection of an official newspaper at an election was enacted in 1919. Laws 1919, chap. 187. Hence, it is manifest that at the time the Corrupt Practices Act was enacted, the legislature had no intention that it should apply to an election held for the purpose of selecting an official newspaper.

The statute relating to the selection of an official newspaper at an election (Laws 1919, chap. 187) provides:

Section 2. "At the first general election held throughout the state of North Dakota after the passage and approval of this act, and at the general election in each even numbered year thereafter the legal voters in each organized county in the state shall be entitled to vote for such newspaper in said county as such voter desires to be selected as the official newspaper therein."

Section 3. "At least thirty days prior to any general election held throughout the state, any person, persons or copartnership or corporation owning or operating a newspaper printed and published within the county and admitted to the United States mails, and having complied with the requirements of the Federal Laws governing second-class mail matter, may apply in writing to the county auditor of the county in which such newspaper is located for the placing of the name of such newspaper upon the general ballot to be voted for as official newspaper at said election. . . ."

Section 4. "Such newspaper in such county receiving the highest number of votes cast for official newspaper shall be declared the official newspaper until the next biennial election and until a successor is chosen and the county auditor upon the canvass and return of said vote by the county canvassing board at the time of canvassing other election returns, shall issue a certificate of election to such newspaper receiving the highest number of votes cast at said election. The owner, proprietor or authorized agent of a corporation owning such newspaper shall file a bond to the State of North Dakota of one thousand dollars for the faithful performance of the duties of such newspaper."

Generally speaking there are two classes of elections, or, rather there are two general subjects submitted at an election. The first relates to

the election of public officers; that is, the choice of certain persons to whom, for the time being, the power to exercise certain governmental functions is entrusted. The other involves the presentation to the electors of some question, measure, proposition or project. Both the courts and the legislatures, generally, recognize a distinction between the two classes as regards the effect of offers or inducements to the voters having a tendency to affect their votes. See McCrary, Elections, 4th ed. § 215 and subsequent; State ex rel. Newell v. Purdy, 36 Wis. 213, 17 Am. Rep. 485; State ex rel. Bill v. Elting, 29 Kan. 397; 15 Cyc. 426, 443.

And it is quite apparent that the lawmakers of this state, when they enacted the Corrupt Practice Act, had in mind the fact that two general subjects were submitted at elections; for, it will be noted that while the language in most of the sections of the Act is applicable only to elections of persons who are candidates for public office, three sections, namely, § 12, relating to treating; § 15, relating to political advertisements published in newspapers, and § 16, relating to electioneering on election day, are made applicable not only to the election of public officers but, also, to elections involving *measures* pending before and to be submitted to the people at such election.

We think that the legislature intended that the provisions of the Corrupt Practices Act should apply to all elections at which any question or proposition was submitted to the electorate. In other words, we think that the legislature in enacting the Corrupt Practices Act intended that the provisions of that Act should apply to all elections thereafter held in the state. The legislature, however, in the Act itself indicated that certain provisions should be applicable to elections of public officers, and other provisions applicable to all elections without regard to whether it involves the choice of a public officer or the approval or rejection of a certain measure or proposition, or the determination of any other question, submitted to the voters at an election. As already indicated, it is manifest that when the legislature enacted the Corrupt Practice Act, it could not have had the election of an official newspaper in mind, as no such election was then held. Hence, obviously the lawmakers could not at that time have considered whether an official newspaper should be deemed a county office within the purview of the Act. And we are not at all satisfied that they manifested

any intention, in the law providing for the election of an official county newspaper, to constitute such newspaper a public officer.

The selection of public officers involves, or should involve, a consideration of the fitness of the candidate for the particular office. "The theory of popular government," said Brewer, J: (State ex rel. Bill v. Elting, 29 Kan. 402), "is that the most worthy should hold the offices. Personal fitness—and in that is included moral character, intellectual ability, social standing, habits of life and political convictions—is the single test which the law will recognize." Every public office is created in the interest and for the benefit of the people and belongs to them. The incumbent of such office is invested with certain powers or charged with certain duties pertinent to sovereignty. 22 R. C. L. p. 374. The powers so delegated to the officer are held in trust for the people. 22 R. C. L. p. 379. "And it is the presumption of law that a public office is to be held and executed by the person appointed or elected to it, and it is opposed to the policy of the law to permit an office to be held by one ostensibly as the real officer, but in secret trust for another." Mechem, Pub. Off. § 566.

It is presumed that an officer is chosen because of his fitness to perform the duties of his office, and except in those cases where the law expressly or by necessary implication permits the officer to deputize some one to act for him, it is contemplated that he shall perform the duties of office in person. Even in cases where the officer is authorized to deputize some one to act in his stead, the officer remains the source through which the deputy has power to act. And it is wholly inconsistent with our theory of government that the incumbent of an office may in fact vacate the office, and transfer it and the powers incident thereto to some one else. Under our law (Comp. Laws 1913, § 683), when the incumbent of an office dies, the office becomes vacant, and the deputy, if any, does not become an incumbent of the office. The same is true if the officer becomes insane, and his insanity is judicially determined; if he is convicted of a felony or of any offense involving moral turpitude; or, if he removes from and ceases to be a resident of the state or of the district, county, city, township or village, in which the duties of his office are to be discharged, or for which he was elected.

It is difficult to see how these considerations can apply to an official newspaper. No restriction is placed upon the disposition of such news-

paper. If the property is owned by a corporation, the stock may be sold, and the newspaper come under a new management, and its policies completely changed. The same is true if the newspaper is owned by an individual or by a partnership. In fact such newspaper may be sold to the owner or owners of a newspaper which was an opposing candidate for official newspaper at the election and refused approval by the electors. In the case at bar, for instance, there is no inhibition against the owners and publishers of the Ransom County Farmers Press becoming the owner or owners of the Lisbon Free Press.

In the view we take of the case, however, it is unnecessary to determine whether the election of an official newspaper is the election of an officer, or an election involving a measure, within the purview of the Corrupt Practice Act.

If it is the former, then as respondents contend the election was subject to contest under the express language of §§ 1046, 1048, Comp. Laws 1913. And violations of the Corrupt Practice Act of the nature claimed here may be asserted in such contest. Diehl v. Totten, 32 N. D. 131, 155 N. W. 74, Ann. Cas. 1918A, 884. Hence, there was a plain, speedy and adequate remedy at law available to the unsuccessful candidate, and an action in equity will not lie. See 9 R. C. L. p. 1152; 20 C. J. 216. Whether it is true as suggested that the remedy by contest is exclusive is not involved, and we express no opinion on that question. See, however, 20 C. J. 213; State ex rel. Butler v. Callahan, 4 N. D. 481, 61 N. W. 1025. Nor do we express any opinion as to whether an equitable action will lie under any circumstances to try issues and determine rights such as it is sought to have tried and determined here. See, however, 9 R. C. L. p. 143; 20 C. J. 216.

If it is the latter, that is, if it is an election involving a measure, then there is no provision of the Corrupt Practice Act which ipso facto invalidates the election upon the mere showing of a promise as that alleged to have been made by the publisher of the Lisbon Free Press.

The order appealed from is affirmed.

CHRISTIANSON, NUESSLE, JOHNSON, and BIRDZELL, JJ., concur.

BRONSON, Ch. J., concurs in the principles stated in the syllabus and in an affirmance.