DISTRICT ONE REPUBLICAN COMMITTEE, Tod Maleckar, Chairman; and Vern Neff, Plaintiffs, Contestants and Appellants,

v.

DISTRICT ONE DEMOCRAT COMMITTEE, Glenna Meiers, Chairperson, District 1 Democrat Committee; James C. Yockim, individually; Glenna Meiers, individually; Donna S. Yockim, individually, and all other as yet unnamed persons who assisted, participated in drafting and/or knowingly distributing alleged defamatory handout distributed November 5, 1990, in alleged violation of Chapter 16.1–10, N.D.C.C., Defendants, Contestees and Appellees.

Civ. No. 910017.

Supreme Court of North Dakota.

March 5, 1991.

Bjella, Neff, Rathert, Wahl & Eiken, P.C., Williston, for plaintiffs, contestants and appellants; argued by Charles L. Neff.

McGee, Hankla, Backes & Wheeler, Ltd., Minot, for defendants, contestees and appellees; argued by Orlin W. Backes. Appearance by Brian W. Hankla.

ERICKSTAD, Chief Justice.

Vern Neff and the District One Republican Committee, Tod Maleckar, Chairman [Contestants], appeal from a judgment dismissing their election contest against James C. Yockim, individually; the District One Democrat Committee, Glenna Meiers, Chairperson, District 1 Democrat Committee; and Glenna Meiers, individually [Contestees][1]. We affirm.

In the November 6, 1990 general election, Neff, incumbent Yockim, and independent David Westerso were candidates for the office of State Senator from the First Legislative District in Williams County, North Dakota. On November 4, 1990, George Gaukler, the State Democratic chairman, advised Yockim that the latest

---

1. Pursuant to a motion by the contestants before trial, the court dismissed the action against Donna Yockim.

election polls indicated that the District One Senate race was a dead heat. Gaukler and Yockim discussed last minute campaign strategy, and they decided to distribute a campaign flier in District One on November 5, 1990, the day before the election.

The subject of the flier was Neff's involvement with the Hedderich building in Williston, and the failure to pay property taxes and special assessments which resulted in Williams County taking the property through a tax deed proceeding. During a conference call on November 5, 1990, Yockim, Gaukler, and Gerald Rustad, a member of Yockim's campaign advisory committee, edited a draft of the flier to choose the words which were most "useful" and "precise" to persuade the residents of District One to vote for Yockim.

Approximately 5,000 copies of the edited flier were printed on orange paper with black lettering:

**"WHY DON'T REPUBLICANS CARE ABOUT HIGH PROPERTY TAXES?**

"The Story the Williston Herald Refused to Print ...

"Republican State Senate candidate Vern Neff owned an interest in the Hedderich's building in Williston. For five years Mr. Neff and his partners did not pay the property taxes. Last year he turned the building back to the taxpayers of Williston and handed you a bill for **$80,000.00.**

**"Then Mr. Neff walked away.**

"Now he thinks you should send him to the State Senate.

"The fact is Vern Neff and his partners failed to pay their taxes here in Williston. Is he then qualified to go to Bismarck and deal with state tax policy? We don't think so.

"Recently, Senator Jim Yockim fought for and won over $300,000 in property tax relief for Williston. Why didn't your property taxes go down?

**"Mr. Neff and his friends took care of that. You paid for his property taxes.**

"During the 1989 legislative session Senator Yockim sponsored a bill to make the speculators pay their property taxes in-

stead of dumping the property onto the local property owners.

**"Mr. Neff opposed this bill.** After it failed he dumped the Hedderich's building back onto you.

**"The real tragedy is that what Mr. Neff did was perfectly legal.** As a lawyer he knew it.

**"DO YOU REALLY THINK THAT WE NEED ANOTHER LAWYER IN BISMARCK?"**

On the afternoon of November 5, 1990, Glenna Meiers, the District Chairperson for the District One Democratic Party, called an elementary school teacher who made an announcement on the school's public address system to solicit volunteers to distribute the orange fliers. The volunteers distributed the orange fliers between 5:00 and 11:00 p.m. that night. Some of the volunteers personally delivered the orange fliers to residents of District One while other volunteers simply left the orange fliers in doorways. Consequently, some of the orange fliers were not read until election day. The certified results of the election disclosed that Yockim received 2101 votes, Neff 1925 votes, and Westerso 270 votes.

The contestants then commenced this election contest pursuant to Ch. 16.1–16, N.D.C.C., alleging that the contestees violated Sections 16.1–10–01(1) and (3); 16.1–10–02; 16.1–10–04; and 16.1–10–06 of the corrupt practices act [Ch. 16.1–10, N.D.C.C.]. The contestants alleged that the statements in the orange flier were "knowingly" and "deliberately calculated falsehoods" designed to prevent Neff's election to the Senate.

The contestees answered, generally denying that their conduct violated the corrupt practices act. Alternatively, they alleged that a corrupt practices act violation is not grounds for an election contest under Ch. 16.1–16, N.D.C.C. The contestees also alleged that the statements in the orange flier were protected free speech under the First and Fourteenth Amendments of the United States Constitution.

The contestees moved for summary judgment, contending that a corrupt practices

act violation is not grounds for an election contest under Ch. 16.1–16, N.D.C.C. The trial court withheld a ruling on the motion pending the presentation of evidence at trial. After trial the court denied the contestees' motion, concluding that Section 16.1–16–02, N.D.C.C., incorporated the corrupt practices act into Ch. 16.1–16, N.D.C.C., and that, although a criminal action may be brought, a civil election contest is a viable method to contest alleged violations of the corrupt practices act.

At trial, there was evidence presented that, in 1978, Neff and his business partner, Loye Ashton, d/b/a Hedderich Realty, purchased an interest in commercial property in Williston known as the Hedderich building by contract for deed from Ione M. and Helen M. Howard. The contract for deed was not recorded and the Howards remained record title owners of the Hedderich building. The contract for deed required Ashton and Neff to pay all property taxes and special assessments on the Hedderich building. Property taxes and special assessments were not paid from 1984 through 1989, and in 1989 Williams County commenced proceedings to obtain a tax deed on the property. Williams County obtained a tax deed in November 1989 and deeded the property to the City of Williston on February 15, 1990. The City of Williston, through city attorney Gerald Rustad, then entered into negotiations with Ashton which culminated in a Lease with Option to Purchase the property. Neff had no dealings with Williams County or the City of Williston after the property was taken through a tax deed proceeding, and he is not a party to the Lease with Option to Purchase. Prior to the general election, Yockim investigated Neff's interest in the Hedderich building and requested that the Williston Herald print a story about that subject. However, the Williston Herald did not do so.

At trial, there was also evidence presented that during the 1989 legislative session, Yockim sponsored SB 2326 which added special assessments to Ch. 57–21, N.D.C.C., dealing with priorities of taxes over a mortgage holder's right to receive rents from commercial property. Neff, in a private conversation with Marlene Eide, who was a Williams County Commissioner, a registered lobbyist, and an employee of the law firm in which Neff was a partner, told Eide that, in his opinion, he did not think SB 2326 would "stand the test" or "hold up." When Yockim asked Eide to support SB 2326, she told him of her conversation with Neff and that her conversation with Neff was one of the reasons why she did not support SB 2326. SB 2326 received a do not pass recommendation from the Senate Finance and Taxation Committee and was defeated on the floor of the Senate.

After trial the court determined that the contestees were not guilty of electioneering on election day under Section 16.1–10–06, N.D.C.C., because the orange flier was delivered before election day within the meaning of that statute. The court also found:

"IV.

"There is some falsity in the language contained in the orange flier. The orange flier uses the plural 'partners' when Vern Neff had only one partner. The orange flier used the word 'opposed' when Vern Neff did not take what fairly could be described as opposition to Senate Bill 2326.

"V.

"The orange flier in some instances does not tell the full story by statements and words in the flier such as: 'The story the Herald refused to print.' 'You paid his taxes.' 'The $80,000 bill.' 'That he walked away.', just to mention a few of them.

"VI.

"Although the orange flier contained some statements which are false and some which may tell only half the story, there is a factual basis behind the statements which prevent a finding that the false statements so found were knowingly sponsored by the defendants with the knowledge that the statements were in violation of 16.1–10–04 N.D.C.C. and rele-

vant statutes. As such, defendants did not violate N.D.C.C. 16.1–10–04 and relevant statutes.

\* \* \* \* \* \*

"VIII.

"The use of the P.A. system from a public school to announce to teachers that volunteers were needed to distribute the orange flier is technically a violation of North Dakota Century Code 16.1–10–02. However, such violation is trivial and is no more serious than the conduct described in *Saefke v. Vande Walle,* 279 N.W.2d 415 (N.D.1979). As such, it is not enough to void an entire election or strip an individual of his office.

"IX.

"Under the North Dakota Corrupt Practices Act, and specifically Chapter 16.1–10 of the North Dakota Century Code, where there are allegations of false statements made in campaign literature such as in this case the statements must first be determined to be false and if they are determined to be false then the Court must make a determination that the false statements were knowingly made as that term is defined in a criminal context. They were not so made in this case."

The court dismissed the contestants' action, and they have appealed.

We initially consider whether an alleged violation of the corrupt practices act [Ch. 16.1–10, N.D.C.C.] is grounds for an election contest under Ch. 16.1–16, N.D.C.C. The trial court determined that Section 16.-1–16–02, N.D.C.C., incorporated the corrupt practices act into the election contest provisions of Ch. 16.1–16, N.D.C.C., and concluded that a corrupt practices act violation is grounds for a civil election contest even though a criminal action may also be brought. Although the contestees have

not raised this issue on appeal, it involves the court's jurisdiction to determine an alleged violation of the corrupt practices act in a civil election contest. That issue involves the court's jurisdiction, and we may raise it *sua sponte. State v. Sadowski,* 329 N.W.2d 583 (N.D.1983).

■ At common law there was no right to contest a public election in a court because elections were part of the political branch of government and were beyond the control of the judicial branch. 26 Am. Jur.2d, *Elections,* §§ 316, 328 (1966). An election contest is therefore dependent upon constitutional and statutory authority to invoke the jurisdiction of the courts. 26 Am.Jur.2d, *Elections,* § 328; *Timm v. Schoenwald,* 400 N.W.2d 260 (N.D.1987)[2]; *Cahill v. McDowell,* 40 N.D. 625, 169 N.W. 499 (1918). We therefore examine the relevant statutory provisions involving the court's jurisdiction and the grounds for an election contest within the framework of our rules of statutory construction.

■ In construing statutory provisions, our duty is to ascertain the intent of the Legislature. *E.g., County of Stutsman v. State Historical Society,* 371 N.W.2d 321 (N.D.1985). The Legislature's intent must be sought initially from the statutory language. *Id.* Statutory provisions must be considered as a whole with each provision harmonized, if possible. *Id.* In interpreting statutory provisions, every effort must be made to give each word, phrase, clause, and sentence meaning and effect. *Id.* Where a general provision conflicts with a special provision in the same enactment, the two should be construed, if possible, to avoid an irreconcilable conflict and give effect to both provisions. Section 1–02–07, N.D.C.C.; *City of Fargo v. Dawson,* 466 N.W.2d 584 (N.D.1991). If the statutory language is clear and unambiguous, that language cannot be disregarded under the pretext of pursuing the legisla-

---

**2.** Art. IV, § 12, N.D. Const., states that legislative election contests are subject to judicial review as provided by law. In *Timm v. Schoenwald, supra,* we held that, under Sections 16.1–16–10 through 16.1–16–17, N.D.C.C., district courts did not have jurisdiction to hear legislative election contests and that such contests could only be heard before the Legislature. Since that decision, the Legislature has repealed Sections 16.1–16–11 through 16.1–16–17, N.D.C.C., and amended Section 16.1–16–10, N.D.C.C., to provide that "[l]egislative election contests must be determined in court as provided in this chapter for other contests."

tive intent because the intent is presumed to be clear from the face of the statute. *County of Stutsman, supra*. However, if the statutory language is ambiguous or of doubtful meaning, we may look to extrinsic aids to interpret the statute. *Id.*

■ Section 16.1–16–02, N.D.C.C., provides:

*"Who may contest election. A defeated candidate* or ten qualified electors *may contest the* nomination or *election of any person* or the approval or rejection of any question or proposition submitted to a vote of the electorate, *pursuant to chapters* 16.1–04, 16.1–05, 16.1–06, 16.1–07, 16.1–08, 16.1–09, *16.1–10*, and 16.1–11. In a county election to change the county seat or to change the boundaries of the county, the complaint shall be filed against the board of county commissioners, who shall appear and defend the contest action." [Emphasis added.]

Section 16.1–16–05, N.D.C.C., provides: *"Grounds for election contest.* An election contest may be commenced for any of the following causes:

"1. If the contestee does not or cannot meet the qualifications to hold the office as required by law.

"2. Because of illegal votes or erroneous or fraudulent voting, count, canvass, or recount of votes."

When considered together, Sections 16.1–16–02 and 16.1–16–05, N.D.C.C., do not clearly describe whether a corrupt practices act violation is grounds for an election contest under Ch. 16.1–16, N.D.C.C. Section 16.1–16–05, N.D.C.C., specifically identifies two grounds for an election contest but does not unambiguously state whether or not they are the exclusive grounds for an election contest under Ch. 16.1–16, N.D.C.C. The broad standing conferred by Section 16.1–16–02, N.D.C.C., to contest an election adds to the ambiguity about whether or not the grounds to contest an election in 16.1–16–05, N.D.C.C., are exclusive. Because these provisions are ambiguous, we may look to extrinsic aids to ascertain the Legislature's intent.

Section 1–02–39, N.D.C.C., provides:

*"Aids in construction of ambiguous statutes.* If a statute is ambiguous, the court, in determining the intention of the legislation, may consider among other matters:

"1. The object sought to be attained.

"2. The circumstances under which the statute was enacted.

"3. The legislative history.

"4. The common law or former statutory provisions, including laws upon the same or similar subjects.

"5. The consequences of a particular construction.

"6. The administrative construction of the statute.

"7. The preamble."

We initially look to legislative history to determine this issue.

In *Timm v. Schoenwald, supra,* 400 N.W.2d at 262, n. 1, we traced the historical development of our current election law, title 16.1, N.D.C.C., which is the

"election law revision which began during the 1975 legislative session and culminated with the enactment of H.B. 1225 by the 1981 Legislature. 1981 N.D.Sess. Laws Ch. 241. The 1975 Legislature directed the Legislative Council to revise and modernize our election laws. HCR 3017. During the 1975–1977 legislative interim, the Committee on Judiciary 'A' studied existing Title 16 of the North Dakota Century Code relating to election law. As a result of that study, H.B. 1049 was introduced in the Forty-fifth Legislative Assembly and, with amendments, was adopted but was subsequently vetoed by the Governor. 1977 N.D. Sess.Laws Ch. 584. The vetoed bill was reintroduced in the 1979 session as H.B. 1138 and after extensive hearings and revision was again passed by the Legislature and vetoed by the Governor; however, that veto was overridden. 1979 N.D.Sess.Laws Ch. 271. Most of the provisions of that measure were referred to the voters in the November 4, 1980, election and failed to win approval. 1981 N.D.Sess.Laws Ch. 653. In 1981 the bulk of the final 1979 session product was reintroduced as H.B. 1225. After

extensive hearings and revision, H.B. 1225 was enacted into law. 1981 N.D. Sess.Laws Ch. 241."

As originally introduced in the 1977 legislative session, Section 16.1–16–05 included three subsections:

"GROUNDS FOR ELECTION CONTEST.) An election contest may be commenced for any of the following causes:

"1. Any deliberate and material violation of this title, or of any other law relating to the election process.

"2. If the contestee, at the time of the election in question, was not eligible to hold the office.

"3. Because of illegal votes or erroneous or fraudulent count, canvass, or recount of votes."

That language was part of HB 1049 which the Governor vetoed. 1977 N.D. Sess.Laws Ch. 584. The identical language was reintroduced in the 1979 legislative session as HB 1138. During the 1979 session the Legislature deleted the "any deliberate and material violation of this title, or of any other law relating to the election process" language in subsection 1, amended subsection 2 to its current language, and renumbered the subsections. Although the 1979 Legislature deleted the proposed subsection 1 in Section 16.1–16–05, N.D.C.C., it made no changes in Section 16.1–16–02, N.D.C.C., which had been introduced in the 1977 and 1979 session in its current form. The Governor again vetoed the entire election reform law; however, that veto was overridden. 1979 N.D.Sess. Laws Ch. 271. The measure was referred to the voters and failed to win approval. 1981 N.D.Sess.Laws Ch. 653. Most of the final product from the 1979 session, including the current language of Sections 16.1–16–05 and 16.1–16–02, was introduced during the 1981 legislative session and was enacted into law. 1981 N.D.Sess.Laws Ch. 241.

Neither the minutes of the 1975–1977 interim study of the election law reform, nor the 1977 legislative history of HB 1049 specifically indicate whether or not the 1977 Legislature intended a corrupt practices act violation to be grounds for an election contest. The 1979 legislative history of HB 1138, including the written minutes and oral tapes of committee meetings, does not specifically explain why subsection (1) of Section 16.1–16–05, N.D.C.C., was deleted. Moreover, the 1981 legislative history does not address whether or not a corrupt practices act violation is grounds for an election contest.

However, the 1979 House Judiciary Committee minutes for HB 1138 indicate that the introduced versions of the corrupt practices act and election contest provisions were changed during that legislative session to tie provisions of the corrupt practices act and impeachment together to avoid a conflict with the constitutional requirement that certain officials who are in office can only be removed by impeachment. Thus, the 1979 Legislature also deleted the following language from the version of the corrupt practices act introduced during that session:

"CANDIDATE GUILTY OF CORRUPT PRACTICE TO VACATE NOMINATION OF OFFICE—FILLING VACANCY.) *Upon the trial of an action* or proceeding under the provisions of this chapter [Corrupt Practices Act] *to contest the right of any person declared to be* nominated or *elected to any office,* to annul or set aside such election, or to remove any person from his office, if it shall be proved that such person was guilty of any corrupt practice, illegal act, or undue influence in or about such nomination or election, he shall be punished by being deprived of the nomination or office, as the case may be. Such vacancy shall be filled in the manner provided by law." [Emphasis added.]

The 1979 Legislature replaced that deleted language with the current provisions of Section 16.1–10–07:

"*Candidate guilty of corrupt practice to vacate nomination of office.* If any person is found guilty of any corrupt practice he shall be punished by being deprived of his government job, or his nomination or election shall be declared void, as the case may be. This section shall not remove from office a person

who is already in office and who has entered upon the discharge of his duties where such office is subject to the impeachment provisions of the Constitution of North Dakota."

The deleted language was similar to the statute relied upon in *Diehl v. Totten*, 32 N.D. 131, 155 N.W. 74 (1915), and *Ransom County Farmers' Press et al. v. Lisbon Free Press*, 49 N.D. 1165, 194 N.W. 892 (1923), to support this court's decision that a corrupt practices act violation was grounds for an election contest and was also similar to the statute in effect when *Snortland v. Crawford*, 306 N.W.2d 614 (N.D.1981), was decided. Thus, the statutory authority for those decisions was deleted in 1979.

Additionally, the 1979 Legislature deleted the following language from the version of the corrupt practices act introduced during that session:

"WHEN ACTION TO CONTEST ELECTION TO BE COMMENCED.) *Any action to contest the right of any person declared elected to any office,* or to annul and set aside such election, or to remove from or deprive any person of an office of which he is the incumbent, *for any offense mentioned in this chapter, shall be commenced and pursued in accordance with chapter 16.1–16* [Election Contest]." [Emphasis added.]

We believe that the changes by the 1979 Legislature to the legislation introduced during that session indicate a specific legislative intent to remove a corrupt practices act violation from the grounds for a civil election contest. We are not persuaded that a reference to the corrupt practices act in Section 16.1–16–02, N.D.C.C., requires a different conclusion. The specific legislative action to remove "any deliberate and material violation of this title, or of any other law relating to the election process" in Section 16.1–16–05, N.D.C.C., as grounds for an election contest, coupled with the specific deletions of language in the introduced version of the corrupt practices act requiring actions under that act to be commenced and pursued in accordance with the chapter for an election contest, indicates a legislative intent to delete a corrupt practices act violation as grounds for an election contest.

Additional support for that conclusion is derived from the sanctions for a violation of the corrupt practices act which include a class A misdemeanor, Sections 16.1–10–04 and 16.1–10–08, N.D.C.C.; an infraction, Section 16.1–10–06, N.D.C.C.; and a declaration that the election is void, Section 16.-1–10–07, N.D.C.C. If a violation of the corrupt practices act were grounds for a civil election contest and a criminal prosecution, then one of the sanctions, voiding an election, would be available under both civil and criminal proceedings despite the different degree of proof for each proceeding. The existence of a different degree of proof for one of the same sanctions could conceivably permit an inconsistent result depending upon the procedure employed. We do not believe the Legislature intended the possibility of an inconsistent result. *See Williams County Social Services Board v. Falcon*, 367 N.W.2d 170 (N.D. 1985). Although we recognize that criminal and civil actions may be available for the same conduct, those cases generally involve different remedies. *Fargo Women's Health v. FM Women's Help*, 444 N.W.2d 683 (N.D.1989). Because the different degree of proof for the sanction of voiding an election could lead to inconsistent results, we do not believe the Legislature intended to make a corrupt practices act violation grounds for a civil election contest.

The contestants nevertheless alleged in their complaint that these corrupt practices act violations were grounds for contesting an election because Yockim "does not and cannot meet the qualifications to hold office as required by law" and that the orange flier "was a fraud upon the public thereby causing an erroneous or fraudulent vote" within the meaning of Section 16.1–16–05, N.D.C.C. We disagree.

Art. IV, § 5, N.D. Const., provides:

"*Section 5.* Each person elected to the legislative assembly must be, on the day of the election, a qualified elector in the district from which the member was

chosen and must have been a resident of the state for one year immediately prior to that election."

Art. IV, § 10, N.D. Const., provides:

"*Section 10.* No member of the legislative assembly, expelled for corruption, and no person convicted of bribery, perjury or other infamous crime shall be eligible to the legislative assembly, or to any office in either branch thereof."

Those constitutional provisions set forth qualifications for legislators. Art. IV, § 10, N.D. Const., is in harmony with our interpretation that a corrupt practices act violation is not grounds for an election contest because that constitutional provision contemplates a conviction of "bribery, perjury or other infamous crime" before a person is ineligible for the legislative assembly. Moreover, the contestants' allegations in their complaint ignore the Legislature's specific action in deleting subsection 1 from Section 16.1–16–05, N.D.C.C., in 1979.

We conclude that the district court lacked jurisdiction to hear this civil election contest for an alleged violation of the corrupt practices act. Although the trial court did not base its decision on this issue, we do not reverse a proper judgment merely because the trial court's reasoning in arriving at that judgment was incorrect if the result is the same under applicable reasons. *E.g., Radspinner v. Charlesworth,* 369 N.W.2d 109 (N.D.1985). The judgment dismissing the election contest is sustainable on this issue.

■ Because we have decided this case on a jurisdictional issue which the parties did not argue to this court and because the merits of the issues raised by the parties involves an important public issue regarding a co-equal branch of government, we will discuss those issues. *Cf. Forum Publishing Co. v. City of Fargo,* 391 N.W.2d 169 (N.D.1986) [an issue is not moot if the matter is one of great public interest].

The contestants contend that the trial court clearly erred in finding that, pursuant to Section 16.1–10–04, N.D.C.C., Yockim did not knowingly sponsor false statements in the orange flier.

Section 16.1–10–04, N.D.C.C., provides: "*Publication of false information in political advertisements—Penalty.* No person may knowingly sponsor any political advertisement or news release that contains any assertion, representation, or statement of fact, including information concerning a candidate's prior public record, which the sponsor knows to be untrue, deceptive, or misleading, whether on behalf of or in opposition to any candidate for public office, initiated measure, referred measure, constitutional amendment, or any other issue, question, or proposal on an election ballot, and whether such publication is by radio, television, newspaper, pamphlet, folder, display cards, signs, posters or billboard advertisements, or by any other public means. Any person who violates the provisions of this section is guilty of a class A misdemeanor."

■ In *Snortland v. Crawford,* 306 N.W.2d 614 (N.D.1981), this court applied the definition of "knowingly" in the criminal code [Section 12.1–02–02(1)(b), N.D.C.C.] to an alleged corrupt practices act violation and held that "knowingly sponsor" a false statement under our prior corrupt practices act [3] meant that a sponsor

---

**3.** Section 16–20–17.3, N.D.C.C., was in effect when *Snortland* was decided. That statute provided:

"*Publication of false information in political advertisements—Penalty.—No person shall knowingly sponsor any political advertisement containing false information,* whether on behalf of or in opposition to any candidate for public office, initiated measure, referred measure, or constitutional amendment, and whether such publication shall be by radio, television, newspaper, pamphlet, folder, dis-

play cards, signs, posters or billboard advertisements, or by any other public means. Any person who shall violate the provisions of this section shall be guilty of a class A misdemeanor." [Emphasis added.]

When the Legislature enacted our election law revision in 1981, Section 16.1–10–04, N.D.C.C., provided:

"*Publication of false information in political advertisements—Penalty. No person shall knowingly sponsor any political advertisement or news release containing deliberately calcu-*

must have had a firm belief, unaccompanied by substantial doubt, in the falsity of the statement. We observed that, under that standard, a false statement which is negligently made is protected speech. *Cf.*, *State v. Kaufman*, 310 N.W.2d 709 (N.D. 1981). We thus rejected the argument that "knowingly sponsor" meant whether a reasonably prudent person knew or should have known that a statement was false.

We said that sensitive First Amendment considerations for political speech dictated that stringent mental culpability requirement and that the constitutional requirements necessary to impose liability for defamation of a public figure also established a minimum culpability for political speech. *Brown v. Hartlage*, 456 U.S. 45, 102 S.Ct. 1523, 71 L.Ed.2d 732 (1982); *Monitor Patriot Co. et al. v. Roy*, 401 U.S. 265, 91 S.Ct. 621, 28 L.Ed.2d 35 (1971); *Vanasco v. Schwartz*, 401 F.Supp. 87 (E.D.N.Y.1975), *aff'd mem.*, 423 U.S. 1041, 96 S.Ct. 763, 46 L.Ed.2d 630 (1976); *see New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

In *Brown v. Hartlage, supra,* 456 U.S. at 52, 60–61, 102 S.Ct. at 1528, 1532–1533, 71 L.Ed.2d at 740, 745–746, the United States Supreme Court recognized the conflicting interests involved with the First Amendment and elections:

"States have a legitimate interest in preserving the integrity of their electoral processes.... But when a State seeks to uphold that interest by restricting speech, the limitations on state authority imposed by the First Amendment are manifestly implicated.

\* \* \* \* \* \*

"[D]emonstrable falsehoods are not protected by the First Amendment in the same manner as truthful statements.... But 'erroneous statement is inevitable in free debate, and ... it must be protected if the freedoms of expression are to have the "breathing space" that they "need ... to survive," ' ...

"The chilling effect of such absolute accountability for factual misstatements in the course of political debate is incompatible with the atmosphere of free discussion contemplated by the First Amendment in the context of political campaigns."

Our decision in *Snortland, supra,* 306 N.W.2d at 623, also recognized those important interests when we said:

"While it may be argued that this standard [for knowingly sponsor] puts a premium on ignorance, encourages sponsors not to inquire into the truth of their statements, and allows the issue to be decided by a sponsor's testimony that he

lated falsehoods, whether on behalf of or in opposition to any candidate for public office, initiated measure, referred measure, or constitutional amendment, and whether such publication shall be by radio, television, newspaper, pamphlet, folder, display cards, signs, posters or billboard advertisements, or by any other public means. Any person who shall violate the provisions of this section shall be guilty of a class A misdemeanor." [Emphasis added.]

The 1989 Legislature deleted the language "deliberately calculated falsehood" and adopted language that the "sponsor knows [the statement] to be untrue, deceptive, or misleading." 1989 N.D.Sess.Laws Ch. 256, § 1. The legislative history indicates that that amendment was made to make political campaign advertising more like commercial advertising. Thus, our current law is broader and prohibits a person from "knowingly sponsor[ing] any political advertisement ... which the sponsor knows to be untrue, deceptive, or misleading."

In this case the contestants' complaint alleged that the statements in the orange flier "were

'knowingly' and 'deliberately calculated falsehoods.'" Although the current statute addresses statements broader than a "deliberately calculated falsehood," the contestants' argument in the trial court and this court is based upon the making of false statements. The contestants do not specifically rely upon the "deceptive or misleading" language in the current statute. Consequently, we do not address issues under the "deceptive or misleading" language. We note, however, that a construction of those terms to mean something less than false statements made with actual malice would raise serious constitutional issues under the First Amendment. *Snortland v. Crawford, supra; Brown v. Hartlage,* 456 U.S. 45, 102 S.Ct. 1523, 71 L.Ed.2d 732 (1982); *Monitor Patriot Co. et al. v. Roy,* 401 U.S. 265, 91 S.Ct. 621, 28 L.Ed.2d 35 (1971); *Vanasco v. Schwartz,* 401 F.Supp. 87 (E.D.N.Y. 1975), *aff'd mem.* 423 U.S. 1041, 96 S.Ct. 763, 46 L.Ed.2d 630 (1976); *see New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

published the statement in good faith and was unaware of its probable falsity, neither the defense of truth nor the standard of ordinary care would prevent self-censorship and the subversion of First Amendment policies. Undoubtedly, the State interest in preserving the integrity of the election process and allowing the electorate to choose among candidates on the basis of accurate information is of paramount importance. However, the consequences of penalizing the negligent false statement or the false statement made in good faith would prohibit the free exchange of ideas which lies at the very heart of the First Amendment."

Although the statute construed in *Snortland* is not identical to our current law (see fn. 3) we have retained the "knowingly sponsor" requirement in Section 16.1–10–04, N.D.C.C. Consequently, we apply the rationale from *Snortland* to Section 16.1–10–04, N.D.C.C.

In *Snortland*, we said that a trial court's determination of whether there was knowing sponsorship of a false statement was a finding of fact governed by the clearly erroneous standard of Rule 52(a), N.D.R.Civ.P. A finding of fact is clearly erroneous when, although there is some evidence to support it, the reviewing court, on the entire evidence, is left with a definite and firm conviction that a mistake has been made. *E.g., Zajac v. Great American Insurance Co.,* 410 N.W.2d 155 (N.D. 1987). We give due regard to the trial court's opportunity to judge the credibility of the witnesses and simply because we may have viewed the evidence differently if we had been the initial trier of fact does not entitle us to reverse the trial court. *Id.* A choice between two permissible views of the weight of the evidence is not clearly erroneous. *Id.*

The contestants contend that the trial court clearly erred in finding that Yockim did not knowingly sponsor false statements in the orange flier. The contestants argue that the facts clearly indicate that Yockim knew that Neff did not oppose SB 2326 and that there was no logical and factual connection between the defeat of that bill and Neff "dump[ing] the Hedderich's building back onto" the Williston taxpayers. They assert that the uncontroverted facts show that Neff did not testify in opposition to SB 2326, that Neff did not call, write or speak to any legislator about the bill, and that Yockim had only a brief personal conversation with Eide in which she related that Neff's position on SB 2326 was one reason she did not support the bill.

Yockim testified that he discussed Neff's position on SB 2326 with Eide and that it was his understanding that Neff had reservations about the bill based upon its impact on the banking industry as well as his opinion that it would not "stand the test" or "hold up." Yockim also testified that his belief about Neff's position was reaffirmed at a public forum in Williston one week before the election when Neff said that he would oppose legislation to tighten up the practice of turning property back to the city for unpaid special assessments and taxes. Yockim also testified that it was his belief that, as a constituent, Neff could be opposed to a bill without taking any action other than expressing his opinion to a lobbyist.

The trial court found that Neff did not take what could fairly be described as opposition to SB 2326 but that there was a factual basis for the statement which prevented a finding that it was knowingly sponsored by the contestees with knowledge that it violated Section 16.1–10–04, N.D.C.C. A political statement is not false within the meaning of a corrupt practices act if the evidence discloses any reasonable inference that the statement is factually correct or that it is an expression of opinion. *Committee of 1000 v. Eivers,* 296 Or. 195, 674 P.2d 1159 (1983). This reasoning comports with First Amendment requirements and our decision in *Snortland.*

We do not condone the negative characterizations in the orange flier. However, the knowingly sponsor culpability necessarily requires a consideration of circumstantial evidence, and it is the trier of fact's obligation to draw inferences from circumstantial evidence. *State v. Kaufman,* 310

N.W.2d 709 (N.D.1981). Simply because we may have viewed the evidence differently if we had been the initial trier of fact does not entitle us to reverse the trial court. We give deference to the trial court's opportunity to judge the credibility and demeanor of the witnesses and draw inferences, and we will not reverse a trial court's findings unless we are left with a definite and firm conviction that it made a mistake. The evidence discloses reasonable inferences that the statements were factually supported and were permissible expressions of an opinion. *Committee of 1000, supra.* Although we do not condone those negative characterizations, any implication of a "linkage" between that statement and "dumping" the property on the taxpayers of Williston is an inference which the trial court could, or could not, draw. We are not left with a definite and firm conviction that the trial court made a mistake in finding that Yockim did not "knowingly sponsor" the statement that Neff "opposed" SB 2326 and "dumped" the property on the taxpayers of Williston. We conclude that the trial court's findings about those statements are not clearly erroneous.

The contestants also contend the statements that "[l]ast year he turned the building back to the taxpayers of Williston and handed you a bill for $80,000," and that "you paid for his [Neff's] property taxes" were statements that Yockim knew were false. The contestants argue:

"Yockim knew that the taxes owed by Neff attributable to the Hedderich building were $70,857.17 less the amount recovered by the City on the Ashton lease/option, which totaled in excess of $16,000, lowering any loss to $54,857.17. Further he knew that for the sum of $1.00 the City took title to an asset having a fair market value of $246,700 in 1989. Finally, by examining the County records, Yockim had actual knowledge that Neff did not voluntarily convey the property to the Williston taxpayers— that, in fact, Williams County initiated an adverse tax title proceeding against Neff, Ashton and many others for acquisition of the Hedderich building, and that

Neff made no decision to 'turn back' the building to the Williston taxpayers. No bill for $80,000 was ever handed to the Williston taxpayers. By law, the property which was worth $246,700 in 1989, was taken for the tax debt."

There was evidence that Neff and Ashton purchased an interest in the Hedderich building in 1978, that they did not pay property taxes and special assessments on the property from 1984 through 1989; that Williams County obtained through tax deed proceedings a tax deed for the property for nonpayment of taxes and deeded it to the City of Williston, that Yockim discussed Neff's nonpayment of taxes with the City Auditor and the City and County Director of Tax Equalization, that Yockim checked the records at the Williams County Treasurer's office to verify that the amount owed on the property was $80,000, that Yockim did not know that Ashton had paid $12,000 to the City of Williston for an option to purchase the property, and that Yockim understood the words "turned the building back" to mean that the county had brought proceedings to obtain a tax deed because taxes had not been paid.

Although the negative characterizations in the orange flier that Neff "turned the building back to the taxpayers of Williston," "dumped the Hedderich's building back onto you," and "you paid for his property taxes," are not charitable, nor in a sympathetic vein, and we may have viewed the evidence differently if we had been the initial trier of fact, we cannot say that the trial court clearly erred in finding that there was a factual basis behind the statements so that Yockim did not knowingly sponsor those statements. The trial court's findings of fact about those statements are not clearly erroneous.

 The contestants also contend that the trial court erred in concluding that delivery of the orange flier on the evening before the election did not violate Section 16.1–10–06, N.D.C.C.:

"*Electioneering on election day—Penalty.* Any person asking, soliciting, or in any manner trying to induce or persuade,

any voter on an election day to vote or refrain from voting for any candidate or the candidates or ticket of any political party or organization, or any measure submitted to the people, shall be guilty of an infraction. The display upon motor vehicles of adhesive signs which are not readily removable and which promote the candidacy of any individual, any political party, or a vote upon any measure, and political advertisements promoting the candidacy of any individual, political party, or a vote upon any measure which are displayed on fixed permanent billboards, shall not, however, be deemed a violation of this section."

The contestants contend that the manner of delivery of the orange flier in the late evening hours on the day before the election with the intent that the public find and read it on election day was a violation of Section 16.1–10–06, N.D.C.C. They argue that the "in any manner" language indicates that no political advertising is to be displayed on election day unless it is of the type specifically exempted from the statute, *i.e.*, adhesive signs on motor vehicles or fixed permanent billboards. They assert that if the contestees had personally handed the fliers to the Williston residents on the day before the election, the statute would not have been violated. We disagree with the contestants' argument that the "in any manner" language addresses "effective delivery" of the message and that a violation of the statute occurs if the message is intended to be seen and read on election day.

The language of Section 16.1–10–06, N.D.C.C., prohibits "[a]ny person [from] asking, soliciting, or in any manner trying to induce or persuade, any voter on an election day." The statute prohibits conduct "on an election day" and does not prohibit conduct on the day before an election. Requiring campaign fliers to be per-

sonally handed to prospective voters would impose a requirement that is not included in the statute. *Haggard v. Meier*, 368 N.W.2d 539 (N.D.1985); *Walsvik v. Brandel*, 298 N.W.2d 375 (N.D.1980). The logical extension of the contestants' argument would place an undue burden on campaigners to collect all fliers which are not personally distributed before election day. Moreover, even fliers that are distributed days before election day could conceivably be seen and read on election day and, under an extension of the contestants' argument, would violate the statute. We do not believe the Legislature contemplated that absurd result. *County of Stutsman v. State Historical Society*, 371 N.W.2d 321 (N.D. 1985). Even rules such as *expressio unius est exclusio alterius* and *ejusdem generis* [4] should not be applied to lead to an absurd result. 2A Sutherland, *Statutory Construction*, §§ 47.17, 47.23 (4th ed. 1984); *Aanenson v. Bastien*, 438 N.W.2d 151 (N.D.1989).

The contestants nevertheless argue that their interpretation would serve to prevent last minute election tactics like this and promote an election system where each candidate is fairly and equitably allowed time to respond to issues and statements raised by the opposition. An election contest is governed by statute. *Cahill v. McDowell*, 40 N.D. 625, 169 N.W. 499 (1918); *see* 26 Am.Jur.2d, *Elections*, § 316 (1966). The language of Section 16.1–10–06, N.D.C.C., does not provide for that result, and subject to appropriate constitutional considerations, any regulation of electioneering on the night before an election in the manner suggested by the contestants is more appropriately for the Legislature to enact, not for the Judiciary to proclaim.

In this case the trial court found that the orange flier was delivered between 5:00 and 11:00 p.m. on the day before the elec-

---

**4.** The rule of *expressio unius est exclusio alterius* states that the enumeration of exclusions from a statute indicates that the statute should not apply to all cases not specifically excluded. 2A Sutherland, *Statutory Construction*, at § 47.23.

The rule of *ejusdem generis* states that where general words follow specific words in a statu-

tory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the specific words. 2A Sutherland, *Statutory Construction*, at § 47.17.

tion. Under these circumstances, we agree with the trial court that the contestees did not violate Section 16.1–10–06, N.D.C.C.

The district court judgment is affirmed.

MESCHKE, J., and VERNON R. PEDERSON, Surrogate Judge, concur.

LEVINE, J., concurs in the result.

VERNON R. PEDERSON, Surrogate Judge, sitting in place of GIERKE, J., disqualified.

VANDE WALLE, Justice, concurring specially.

I concur in that portion of the majority opinion which concludes that the district court lacks jurisdiction to hear civil election contests which have as their basis the violation of the Corrupt Practices Act. As the majority opinion observes, at common law there was no right to contest a public election in a court because elections were part of the political branch of the government and were beyond judicial control. Section 12 of Article IV of the North Dakota Constitution, as approved by the electors of this State on November 6, 1984 [*see* 1985 N.D.Laws, ch. 707] modifies that concept slightly and specifies that "[e]ach house is the judge of the qualifications of its members, but election contests are subject to review as provided by law."

In view of the historical precedents which are continued in this constitutional provision, we should conclude the judicial branch of government has jurisdiction to entertain contests of election only when the legislature has authorized us to do so by direct and unequivocal action. *Cf. Timm v. Schoenwald*, 400 N.W.2d 260 (N.D.1987). Where substantial doubt exists as to whether or not the legislature intended the judicial branch to have jurisdiction to hear election contests we should not rationalize a basis upon which to conclude that we have jurisdiction. Chapter 16.1–16 is not direct and unequivocal. Nevertheless, if I were to apply the ordinary standards of statutory construction, I agree with the majority that in matters involving the violation of the Corrupt Practices Act the legis-

lature intended they be tried by criminal action and not by a civil contest of election.